TRUSTEES OF the GRAPHIC COMMUNICATIONS INTERNATIONAL UNION LOCAL 546 HEALTH & WELFARE FUND, et al., Plaintiffs,

v.

LITH–O–KRAFT PLATE CO., INC., dba Lithokraft, Defendant.

Civ. A. No. C86–4474.

United States District Court, N.D. Ohio, E.D.

June 1, 1988.

Stanley D. Gottsegen, R. Jeffrey Pollock, Burke, Haber & Berick, Cleveland, Ohio, for plaintiffs.

Robert T. Rosenfeld, Mary G. Balazs, Walter, Haverfield, Buescher & Chockley, Cleveland, Ohio, for defendant.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

The trustees of the Graphic Communications International Union Local 546 Health & Welfare Fund (the "Fund"), plaintiffs herein, have sued the Lith–O–Kraft Plate Company, dba Lithokraft ("Lithokraft") for the latter's failure to make contributions to the Fund, as is allegedly required by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), and by a series of collective bargaining agreements into which the Fund entered with Lithokraft and other employers. The Fund now moves for summary judgment with respect to Lithokraft's liability under ERISA and the Labor Management Relations Act, 29 U.S.C. §§ 141 *et seq.*, (counts I and IV of its complaint), but does not explicitly address its breach of contract and

promissory estoppel causes of action (counts II and III). In a cross-motion for summary judgment, Lithokraft, which withdrew from the Fund after participating for eight years, argues that it has satisfied any obligation imposed by ERISA or by the collective bargaining agreements. Its brief addresses all but the Fund's promissory estoppel claim. For the reasons set forth below, this Court finds that there is no statutory authority for the imposition of withdrawal liability, and endorses Lithokraft's interpretation of the collective bargaining agreements. The Court accordingly grants Lithokraft's motion for summary judgment with respect to counts I, II, and IV of the Fund's complaint, and directs the parties to brief the remaining, promissory estoppel issue.

I

The relevant facts are not in dispute. Lithokraft is engaged in the commercial printing business and is a member of a multiemployer association known as the Printing Industries Association of Northern Ohio ("PIANO"). The Fund is a health and welfare fund established pursuant to § 302 of the Labor Management Relations Act of 1947 for the purpose of providing health care benefits to the members of the Graphic Communications International Union Local 546. The Fund's trustees include three trustees appointed by the Union, and three appointed by PIANO. Benefits are established by means of collective bargaining agreements negotiated on either an individual employer, or a multiemployer, basis.

From November 1, 1979 through August 31, 1985, Lithokraft was a party to a series of collective bargaining agreements with the Union. Each of these agreements required Lithokraft to contribute a specified amount per week for each employee for as long as that employee remained employed. The Fund, for its part, was required under each agreement to purchase and maintain life, medical, and other types of insurance for covered employees.

The first agreement period was from November 1, 1979 to April 30, 1982, and re-quired Lithokraft to contribute $20.86 weekly for each covered employee. It further provided that "any increase in premium to maintain the present benefit schedule for the term of the Agreement shall be borne by the Employer." The second agreement, which was a Master Contract executed by the Union and thirty-nine printing companies in Northern Ohio, covered the period from May 1, 1982 to April 30, 1985, and required a "maximum" weekly per-employee contribution of $50.00. The burden of bearing increased costs was thereby shifted from participating employers to the Fund. A third contract, which took effect on May 1, 1985 and is still in effect, required Lithokraft to contribute a "maximum" of $68.45, but permitted it to withdraw from the Fund as of August 30, 1985, after which time Lithokraft agreed to secure its own insurance benefits for its employees. All three agreements are otherwise similar in all relevant respects.

The trust agreements between Local 546 and PIANO, which set forth in greater detail the respective rights and obligations of the Fund and of contributing employers, have undergone a similar evolution. The most recent version, entered into on April 18, 1985, expressly limits the financial obligations of participating employers. It provides, in Article II, that

(1) Each Employer shall pay into the Trust Fund such amounts (but only such amounts) as are specifically provided for in the agreement between the Company and the Union ...

and that

(3) Deposit by an Employer with the Trustees of the amount specified in Section (1) of this Article shall be a complete discharge of the Employer's financial obligations under this Plan and Trust, and the Employer's sole financial obligation under this Plan and Trust shall be limited to the payment of the amounts specified in Section (1) of this Article.

Each of the collective bargaining agreements also contains references to a certificate of insurance that details the benefits to which employees and retirees are enti-

tled. No provision in any of the contracts, however, specifically identifies the party or parties responsible for maintaining these benefits. And no provision imposes, at least unambiguously, any obligation on Lithokraft to contribute any amounts additional to its weekly per-employee payments.

The Fund does not dispute that, during the pendency of the three agreements, Lithokraft regularly contributed the required amounts to the Fund. Nor does Lithokraft dispute the fact that the Fund has maintained the requisite insurance policies in full force and effect. The question, rather, is whether Lithokraft can be made to pay, in the words of the Fund's brief, "its pro rata present value share of the ongoing and future liability for health and welfare benefits in respect of all employees who retired during the period in which Lithokraft was an employer participant in the Fund." (Plaintiff's brief at p. 10.)

## II

If Lithokraft is liable for such contributions, as the Fund insists, this liability must arise either from the contracts into which Lithokraft entered, or by operation of law. See *In re White Farm Equipment Co.,* 788 F.2d 1186, 1191 (6th Cir.1986):

> First, we look to basic contract law. Despite any technical legal problems once present in the area of employment contract law, it is settled law that an employer and an employee may contract for post-employment welfare benefits, and this court must, in this case as in *Yard–Man* and the other collective bargaining agreement cases, interpret the contract's terms.

> Second, we look to federal law to see if any express or implicit statutory command or other federal policy mandates a federal common law rule limiting the right of an employer to exercise after retirement a reserved right of termination of employee welfare benefits.

These two sources of possible obligation will be treated in turn.

### A. *The Collective Bargaining Agreements*

■ Withdrawal liability on the part of Lithokraft may be found if it can be inferred from the agreements *both* (1) that such benefits as the Fund was obligated to provide to employees during the pendency of the agreements *vested* upon retirement, and (2) that it is the obligation of the Lithokraft to pay its pro rata share of such unfunded benefits. Because this Court can find no support in the agreements for the second proposition, it declines to find that Lithokraft has incurred withdrawal liability. Accordingly, the Court need not address the issue of whether the benefits sought on behalf of the employees have vested. If vested, these benefits cannot be unilaterally terminated by the Fund. That they cannot, if vested, be so terminated, however, does not settle the issue of which party (the Fund or the employer) is responsible for funding the benefits. Even if Lithokraft were to concede that the benefits had vested, which it does not, Lithokraft could still argue that it was the Fund's, and not its own, responsibility to continue providing the benefits. The question of vesting, then, is not essential to the determination this Court must make, and therefore is not decided.

The critical question is whether any of the collective bargaining agreements to which Lithokraft was a party imposed on it an obligation to fund "its pro rata present value share of the unfunded, vested benefits." The conclusion appears inescapable that none of these agreements did, or does, impose on Lithokraft such an obligation.

Each agreement imposes on Lithokraft an obligation to contribute to the Fund, on a weekly basis, the per-employee amounts specifically set forth therein. In no other provision of any of the agreements has Lithokraft undertaken to contribute additional amounts to the Fund. In particular, no mention is made in any of the contracts of any "withdrawal liability" that Lithokraft would incur upon its withdrawal from the Fund. Even more important, the second and third agreements affirmatively absolve Lithokraft of any additional obli-

gation or liability. Thus the amounts specified in Part XV(a) of each of these two contracts is referred to as "a maximum contribution." And the current trust agreement between Local 546 and PIANO expressly limits the liability of employers to this per-week amount. Particularly decisive in this connection is the language contained under the heading "Employer Contributions," quoted above, which provides that each employer shall pay to the Fund "such amounts (but only such amounts) as are specifically provided for in the agreement between the Company and the Union," and that such contributions "shall be a complete discharge of the Employer's financial obligations under this Plan and Trust ...".

It is clear and unambiguous under these contractual provisions that Lithokraft has, by entering into the agreements, undertaken to make the specified weekly contributions to the Fund, but has expressly declined to assume any additional obligation. For this reason, the Court need not, as it is urged to do by the Fund, supplement its interpretive inquiry after the manner of *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Yard–Man, Inc.*, 716 F.2d 1476, 1479–1480. *Yard–Man* counseled the liberal use of "basic principles of contractual interpretation" in discovering whether an employer had undertaken to provide vested benefits. But while such principles are frequently helpful, and often necessary, in interpreting a collective bargaining agreement, they cannot override the clear intent of the parties thereto expressed in unambiguous language. Thus, while the Court finds it curious that the contracts at issue here contain (or incorporate by reference to the certificate of insurance) provisions that appear to bind neither party to the other,[1] and that are therefore perhaps better explained on an alternative contract interpretation, it cannot consider such provisions as evidence of an intent on the part of Lithokraft to assume any additional liability. The Court can, in short, discern no way to avoid the obvious contractual language limiting Lithokraft's liability to the payment of specified weekly contributions.

Even if the contract were vague or ambiguous with respect to Lithokraft's obligations, the burden would be upon the Fund, as plaintiff, to demonstrate that its interpretation is the more reasonable. And the Court would, in that event, still be obliged to find that the Fund had not met its burden of establishing the withdrawal liability of Lithokraft. *See United Steelworkers of America v. North Bend Terminal Co.*, 752 F.2d 256, 261 (6th Cir.1985) (because the whole burden of proof is on the party alleging breach of a collective bargaining agreement under § 301 of the Labor Management Relations Act, "where there is a mutual misunderstanding as to a contract term ..., the court will rule against the party bearing the burden of proof").

Despite the clear language of the agreements (which suggests that there cannot in this case have been a "mutual misunderstanding"), that Lithokraft should be able to avoid the obligation of funding benefits paid to employees does appear to strain the bounds of equity. The Fund, although a legally cognizable entity capable of entering into and performing under a contract, is in reality a mere vehicle through which a multitude of employers can conveniently funnel health and welfare benefits to employees and retirees. Lithokraft clearly derived a benefit from its participation in the Fund for which, at least if the Fund's estimates of its ongoing liability are accurate, it vastly underpaid, but for which it could not have escaped its obligation to pay had it participated in a "single-employer

---

1. The certificate of insurance, for example, which the Fund argues has been incorporated by reference into the collective bargaining agreements, provides, at p. 4, that "[t]he amount of life insurance on any employee who retires will, on the effective date of his retirement, be reduced to and remain at $1,000.00." These and other, similar contractual terms may bind the Fund to retired employees, or bind the Fund's chosen insurance company to the Fund. But they cannot, even when considered in the context of the entire agreement, be construed as in any way binding on Lithokraft.

plan."[2] In view of the clear language of the agreements, however, the Court can only assume that the Fund underestimated the amounts that would be required from employers to continue funding what the Fund evidently considered would become vested benefits, or else simply did not foresee the eventual need to derive its sustenance from the collection of withdrawal liability. The Fund thus assumed the risk, inherent in any contract, that the deal would turn sour or would prove to have been improvident. Now that that risk has materialized (if indeed it has), the Fund may not now look to Lithokraft to extricate it from the bonds of an ill-conceived bargain.

## B. *ERISA and the MPPAA*

■ Lithokraft may yet be obliged to make the demanded payments to the Fund if the law requires it to do so. The Court must thus assess the consistency of the collective bargaining and trust agreements, which themselves impose no withdrawal liability, with the provisions and policies of federal labor law.

The Fund argues that Lithokraft's refusal to contribute its share of vested benefits is actionable under both § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and § 502(a) of ERISA, 29 U.S.C. § 1132(a). Each of these provisions grants a private right of action to persons aggrieved by violations of other provisions of the LMRA or of ERISA, respectively, or of the applicable terms of a collective bargaining agreement. It remains incumbent on the Fund to specify the nature of the violation sought to be remedied by either statute.

Section 301(a) of the LMRA merely confers jurisdiction on district courts to entertain suits "for violation of contracts between an employer and a labor organization ..." Liability under this section is thus parasitic upon a finding of a contract violation. Because this Court has declined

to make such a finding, it can recognize no liability on the part of Lithokraft under § 301(a). Summary judgment on Count IV of the Fund's complaint, which is premised on this section, is thus granted in favor of Lithokraft.

Like § 301(a) of the LMRA, § 502(a) of ERISA provides a civil remedy for violations of a labor agreement. Under the latter provision, however, the action attempts

> to recover benefits due to [a participant or beneficiary] under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan ... [or] ... to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan....

Once again, the failure of the Fund to establish any violation of "the terms of the plan" absolves Lithokraft, for the most part, of § 502 liability. The only remaining avenue for the Fund is to establish that Lithokraft's acts violate some "provision of this subchapter," i.e., Subchapter I—Protection of Employee Benefit Rights, 29 U.S. C. §§ 1001 *et seq.*

In this connection, the Fund cites several cases that it claims are controlling. The cases, however, are readily distinguishable. *Hansen v. White Motor Corp.*, 788 F.2d 1186 (6th Cir.1986) and *Policy v. Powell Pressed Steel Corp.*, 770 F.2d 609, 610 (6th Cir.1985), for example, established that an employer's failure to provide vested retiree health and welfare benefits is actionable under 29 U.S.C. § 1132(a). Both cases, however, involved a single employer who, as such, assumed sole responsibility for funding such benefits as the court found had vested. Thus neither case contributes to an understanding of the issue in this case: which of two parties is responsible for funding vested benefits where this matter is contested.

---

**2.** The Fund is not, as Lithokraft argues, estopped from attempting to collect withdrawal liability from it simply because it has not pursued previously withdrawing employers. The fact that a person chooses to collect money from only one of several people indebted to him does not mean that he is not entitled to collect from that one. Only if Lithokraft could justifiably have *relied* on the failure of the Fund to pursue the other employers could the Fund be argued to have waived its right to pursue, or to be estopped from pursuing, Lithokraft.

A more fruitful, though as will be shown, ultimately unsuccessful, line of argument would invoke the withdrawal liability provisions of the 1980 ERISA amendments, collectively known as the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. §§ 1001a *et seq.* Congress enacted the MPPAA in response to concerns relating to the withdrawal of employers from multiemployer pension plans. Observing that "withdrawals of contributing employers from a multiemployer pension plan frequently result in substantially increased funding obligations for employers who continue to contribute to the plan, adversely affecting the plan, its participants and beneficiaries, and labor-management relations," 29 U.S.C. § 1001a(a)(4)(A), Congress intended the amendments to "promote benefit security for multiemployer plan participants through the melioration of the financial condition of multiemployer plans," H.R.Rep. No. 869, Part I, 96th Cong., 2d Sess. 1, 51, *reprinted in* 1980 U.S. Code Cong. & Admin. News 2918, 2919. Among the amendments was an elaborate provision imposing "withdrawal liability" on employers whose "obligation to contribute" to the plan had ceased. *See* 29 U.S.C. § 1381. The MPPAA "requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan. This withdrawal liability is the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets." *Pension Benefit Guaranty Corporation v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 2715, 81 L.Ed.2d 601 (1984) (*citing* 29 U.S.C. §§ 1381, 1391).

■ If the Fund in the present case had been established to provide *pension* benefits to employee participants, then, assuming these benefits had vested, it seems clear that Lithokraft would be obligated by the MPPAA to continue making contributions. At issue here, though, is whether the MPPAA imposes a similar withdrawal liability on employers who withdraw from a multiemployer *health or welfare benefit* fund. Several considerations militate against this conclusion.

First, the popular name of the ERISA amendments, the "Multiemployer *Pension* Plan Amendments Act" (emphasis added), is suggestive of its intended scope. Second, the declaration of Congressional policy underlying the Act and set forth at 29 U.S.C. § 1001a adverts only to pension plans and to the consequences of employer withdrawals therefrom. Subchapter III, moreover, which contains the withdrawal liability provisions themselves, establishes the Pension Benefit Guarantee Corporation ("PBGC") to guarantee the continued security of, and availability of funding for, employer *pension* funds. Case law construing subchapter III typically involves the PBGC as a litigant, and invariably concerns pension, as opposed to health and welfare benefit, plans. The provisions imposing withdrawal liability in the case of multiemployer plans, finally, 29 U.S.C. §§ 1381 *et seq.*,[3] are also contained in subchapter III, the amendments to whose definitional section, 29 U.S.C. § 1301, make clear that only pension plans are contemplated. Section 1301(a)(15), as amended, defines a "single-employer plan" as "any defined benefit plan (as defined in § 1002(35) of this title) which is not a multiemployer plan." Section 1002(35), in turn, characterizes a "defined benefit plan" as "a *pension* plan other than an individual account plan ..." (emphasis added). The single-employer plans in respect of which the MPPAA imposes withdrawal liability, then, are clearly and necessarily pension, and not health and welfare benefit, plans. There is, furthermore, no reason to think that the "multiemployer plans" with respect to which § 1381 imposes withdrawal

---

**3.** Lithokraft mistakenly identifies § 1363 as the relevant MPPAA provision imposing withdrawal liability. Section 1363, by its terms, concerns plans "other than multiemployer plans." Because the Fund here is a multiemployer plan, this action is instead governed by Subtitle E of Subchapter III, §§ 1381 *et seq.,* entitled "Special Provisions for Multiemployer Plans." Lithokraft's argument that § 1363 affects only plans "to which § 1321 of this title applies," i.e., pension plans, is therefore beside the point.

liability can be distinguished from the "single-employer plans" of § 1301(a)(15) in any way other than their involving more than one employer. Thus, a multiemployer plan must itself be a "defined benefit plan," which according to § 1002(35) is "a pension plan ...". Absent a compelling analogy between pension plans and health and welfare benefit plans, which does not appear from the statute and is not supplied by the Fund, this Court cannot conclude that Congress intended to impose withdrawal liability on employers withdrawing from the latter sort of plan. Nor has the Fund referred the Court to any provisions of ERISA or of the MPPAA that suggest otherwise. Statutory authority for the imposition of withdrawal liability in a case such as this is thus wholly lacking.

### III

Although the Fund has moved for summary judgment with respect to only Counts I and IV of its complaint, Lithokraft's motion purports to establish that summary judgment in its favor is proper on all counts. As the Fund points out in its reply brief, however, Lithokraft's brief does not specifically address Count II (breach of contract) and Count III (promissory estoppel), but functions more as a brief in opposition to the Fund's motion. This observation notwithstanding, it is eminently clear that the Fund's breach of contract claim, at least, has been fully answered. The Court accordingly grants summary judgment in favor of Lithokraft with respect to Count II. Because the claims contained in Counts I and IV have been treated and rejected herein, summary judgment in favor of Lithokraft is also appropriate as to them, and is hereby entered.

No mention is made in the briefs from either party, however, of the Fund's promissory estoppel claim. Because this claim may, for all this Court has been told, involve disputed issues of material fact, the Court is not at liberty to dispose of the claim summarily at this time. Instead, the Court directs each party to submit, on or before June 15, 1988, a brief in which the promissory estoppel issue, and the propriety of summary judgment with respect thereto, are discussed.

IT IS SO ORDERED.