**Nicholas DEMISAY, et al., Plaintiffs,**

v.

**LOCAL 144, NURSING HOME PENSION FUND, et al., Defendants.**

No. 85 Civ. 6133 (JES).

United States District Court, S.D. New York.

March 15, 1989.

Gibson, Dunn & Crutcher, New York City (Jonathan L. Sulds, David J. Reilley, M. Chinta Gaston, of counsel), for plaintiffs.

Epstein, Becker, Borsody & Green, P.C., New York City (Henry Rose, Harry N. Turk, of counsel), for defendants.

**60**

## OPINION AND ORDER

SPRIZZO, District Judge:

Plaintiffs bring this action to compel the Local 144 Nursing Home Pension Fund and the New York City Nursing Home—Local 144 Welfare Fund [1] to transfer a share of their reserve funds to the Local 144 Southern New York Residential Health Care Facilities Association Pension and Welfare Funds.[2] Plaintiffs include the management trustees of the Southern Funds ("Southern management trustees"), the employers and management companies that are members of the Southern New York Residential Health Care Facilities Association, Inc. ("Southern employers" and "Southern management companies"), and individual employees of the Southern employers and management companies ("Southern employees"). Defendants are the Greater Funds and the individual trustees of the Greater Funds. Plaintiffs have moved for partial summary judgment on the main claim. Defendants have moved to dismiss for lack of jurisdiction and standing and have cross-moved for summary judgment on the main claim.[3]

### BACKGROUND

The following facts, except as noted, are undisputed.

Until 1981, the Southern Employers were members of the Greater New York Health Care Facilities Association, Inc. ("Greater New York"), a multiemployer bargaining association. See Affidavit of Jonathan L. Sulds ("Sulds Aff.") at ¶ 3. As a consequence of this membership, they were parties to collective bargaining agreements between Greater New York and Local 144, Hotel, Hospital, Nursing Home and Allied Services Employees Union, SEIU, AFL-CIO ("Local 144"). See id. Under these agreements, Southern employers were obligated to contribute to the Greater Funds on behalf of their employees. See id.

The Southern employers withdrew from Greater New York in 1981. Thereafter, they negotiated and executed individual collective bargaining agreements with Local 144 pursuant to which they were obligated to continue contributing to the Greater Funds on behalf of their employees. See id. at ¶ 4.

In 1984, B.N.H. Management Associates, Inc. ("BNH") and the other Southern Employers sought to establish their own employee pension and welfare funds and entered into negotiations with Local 144 for new individual collective bargaining agreements which would accomplish that purpose. See id. at ¶ 5. Pursuant to collective bargaining agreements executed on November 30, 1984, the parties agreed to the establishment of the Southern Funds. See id. at ¶ 7.

The parties dispute what was said during the negotiations leading to these agreements as to whether a share of the Greater Fund reserves would be transferred to the Southern Funds. See id. at ¶ 6–9; Affidavit of Peter Ottley ("Ottley Aff.") at ¶ 2–8. However, the collective bargaining agreement does not contain any provision relating to such transfer, although the agreement did provide that members of or contributors to the Southern Funds could bring suit to compel a transfer and that Local 144 would "not oppose such litigation to the extent it is consistent with applicable law." See, e.g., Sulds Aff., Ex. A at 26.

During these negotiations, Local 144 sought assurances that its members would receive the same level of benefits in the Southern Funds as provided by the Greater Funds. See Sulds Aff. at ¶ 8; Ottley Aff. at ¶ 9. Therefore, the agreements provided for a continuity of benefits for covered employees so that "[n]o employee shall lose benefits as a result of transfer of his/her

---

1. These funds will be referred to as the "Greater Pension Fund" and the "Greater Welfare Fund" or, collectively, the "Greater Funds."

2. These funds will be referred to as the "Southern Pension Fund" and the "Southern Welfare Fund" or, collectively, the "Southern Funds."

3. In addition, defendants moved for summary judgment on their counterclaims, and Local 144 Health Facilities Training and Upgrading Fund moved for intervention pursuant to Fed.R.Civ.P. 24(b)(2). By Order dated March 1, 1988, the Court denied those motions.

coverage" from the Greater Funds to the Southern Funds. *See, e.g.*, Sulds Aff., Ex. A at 16. In addition, under the terms of the agreements, Local 144 agreed to employers making payments to the Southern Funds only on the condition that those Funds provide the same level of benefits as had been provided under the Greater Funds. *See id.*, Ex. A at 16–17.

The collective bargaining agreements further provided for contributions to the new funds. Each signatory employer was to contribute to the Greater Welfare Fund until the date two months prior to the operational date of the Southern Funds. *See* Sulds Aff. at ¶ 10; Ex. A at 20–21. In addition, pension contributions after July 1, 1984 were to be made to an escrow account. *See id.*, Ex. A at 20–21.

Trust agreements establishing the Southern Funds were executed on October 18, 1985, and the board of trustees agreed that the Southern Funds would become operational on December 1, 1985. *See id.* at ¶¶ 11–12 & Exs. B, C, D. Subsequently, the board of trustees of the Southern Pension Fund agreed that the Southern Fund would fully recognize all years of credited service earned under the Greater Pension Fund by any participants who had not vested under that plan.[4] *See id.* at ¶ 13 & Ex. E at 2. Furthermore, for employees vested under the Greater Pension Fund, the Southern Pension Fund would provide a pro rata portion of their ultimate pension benefit.[5] *See id.* at ¶ 14 & Ex. E at 2.

## DISCUSSION

Plaintiffs in this action make three claims. First, they allege that the failure of the Greater Funds' trust documents to provide for the transfer of a portion of their reserves to the Southern Funds is a structural defect in the plans violative of section 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(5) (1982). Next, they allege that the Greater Funds violate section 4234 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1414 (1982), because they do not have asset transfer rules. Finally, plaintiff employees allege that defendant trustees have breached their fiduciary obligations under section 404 of ERISA, 29 U.S.C. § 1104 (1982). The Court will address each of these claims in turn.

### I. *LMRA section 302(c)(5)*

#### A. Jurisdiction

Plaintiffs in their first claim assert a violation of LMRA section 302(c)(5), 29 U.S.C. § 186(c)(5), which provides that employer payments may be made to an employee trust fund established for "the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents)." The federal courts clearly have jurisdiction under section 302(e), 29 U.S.C. § 186(e) (1982), to enforce a trust fund's compliance with this section. *See Local 50, Bakery & Confectionery Workers Union v. Local 3 Bakery & Confectionery Workers Union,* 733 F.2d 229, 234 (2d Cir.1984).

Defendants' argument that there is no jurisdiction here because the Court cannot examine the reasonableness of collectively bargained provisions, *see United Mine Workers of America Health & Retirement Funds v. Robinson,* 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982), is untenable on the facts of this case. Plaintiffs do not challenge the reasonableness of any collectively bargained term, but rather allege that the Greater Funds do not comply with the specific standards of section 302(c)(5).

---

**4.** For example, an employee with nine years credited service under the Greater Pension Fund who retired after participating in the Southern Pension Fund for one year would be vested under the Southern Pension Fund's ten year service requirement and would receive benefits based on ten years of service. *See* Sulds Aff. at ¶ 13 & Ex. E at 2.

**5.** For example, an employee retiring with twenty five years of combined service, with eight years under the Southern Pension Fund, would receive eight/twenty-fifths of his total benefit from the Southern Pension Fund. *See* Sulds Aff. at ¶ 14 & Ex. E at 2.

*See Robinson,* 455 U.S. at 573 n. 12, 102 S.Ct. at 1233 n. 12; *see also infra* note 13. The Court clearly has jurisdiction to review a challenge that the Greater Funds are structurally deficient under that section's "sole and exclusive benefit" standard. *See Local 50, supra,* 733 F.2d at 234; *Alvares v. Erickson,* 514 F.2d 156, 165 (9th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975); *Teamsters Local No. 145 v. Kuba,* 631 F.Supp. 1063, 1068–69 (D.Conn.1986).

### B. Standing

■ Defendants also challenge the standing of plaintiffs to assert their section 302(c)(5) claim. Defendants contend that because the purpose of section 302(c)(5) is to protect the interests of employees, only "employees in the fund" are proper parties to assert this claim. However, although section 302 does not specifically delineate who may sue or be sued, it has been held that employees, unions, trustees and employers all have standing to sue under section 302(c)(5). *See Molnar v. Wibbelt,* 789 F.2d 244, 248–49 (3d Cir.1986) (quoting *Copra v. Suro,* 236 F.2d 107, 114 (1st Cir. 1956)).

Moreover, standing under section 302(c)(5) does not require a nexus to the fund as close as that which may be required under ERISA.[6] *See Molnar, supra,* 789 F.2d at 249. Here, the Southern employers and management companies allege that unless there is a transfer of reserves to the new funds, the employers will be required either to reduce benefits or make more payments into the funds.[7] The Court concludes that this alleged injury is sufficient to establish standing. *Cf. Central Tool Co. v. Int'l Assoc. of Machinists Nat'l Pension Fund, Benefit Plan A,* 811 F.2d 651, 655–56 (D.C.Cir.1987).

**6.** Although standing was not raised as an issue in *Local 50,* the court there allowed a successor trust fund to maintain an action to compel compliance by a predecessor fund with section 302(c)(5). *See Local 50, supra,* 733 F.2d at 234; *see also Alvares, supra,* 514 F.2d at 165.

**7.** In fact, at Oral Argument, counsel for plaintiffs stated that because the Greater Funds have

The standing of Southern employees is less clear, because the employers have agreed that benefit levels will remain the same.[8] However, assuming that the Southern employers are unable to properly fund the Southern Funds in the event that a transfer of reserves is not ordered, the possibility and perhaps the likelihood that their benefit levels might be adversely affected if the employers are financially unable to honor their commitment to the union is sufficient to confer standing to challenge the refusal of the Greater Funds to make that transfer. Moreover, as former employees in a welfare fund who seek to challenge a structural defect in that fund, they also have standing on that basis as well. *See Alvares, supra,* 514 F.2d at 164–65.

The management trustees of the Southern Funds have also sued, but the union trustees have not, and therefore the Southern Funds themselves are not parties to this action. The Southern Fund trust documents provide that trustee decisions shall be made by the concurring vote of a majority of union trustees, acting as one group, and management trustees, acting as one group, and that if trustees are unable to agree on an action, it shall be submitted to arbitration. *See* Sulds Aff. Ex. B at 24, 27 & Ex. C at 24, 27. The management trustees, therefore, cannot sue here without first employing the arbitration procedures in the trust documents. *See Alfarone v. Bernie Wolff Const. Corp.,* 788 F.2d 76, 79 (2d Cir.), *cert. denied,* 479 U.S. 915, 107 S.Ct. 316, 93 L.Ed.2d 289 (1986). Thus, any claim by the management trustees based upon their fiduciary duty to ensure that the Southern Funds contain all reserves to which they are entitled is premature.

### C. The Merits

■ Plaintiff's argument here is that the Greater Welfare and Pension Funds are not transferred assets, there has already been a restructuring of the Southern Funds benefit plan and one form of benefit was dropped after collective bargaining. *See* Transcript at 17, 36.

**8.** Defendants challenge the standing of Southern employees only as it relates to the Greater Welfare Fund.

compelled to transfer a share of their reserves to the Southern Welfare and Pension Funds, not because of any agreement to do so, but because the law requires it. Relying on *Local 50*, the gist of their argument is that section 302(c)(5) makes it unlawful for funds contributed by one employer to be used for the benefit of persons other than its employees once the employer leaves the fund.

Although there is language in *Local 50* that would tend to support this position, that case presented a much different factual setting. In *Local 50*, where the Second Circuit found a structural defect in a union welfare plan, employees of Entenmann's had voted to change their bargaining representative from Local 50 to Local 3. As a result, Entenmann's began contributing to the Local 3 welfare fund, and the Local 3 trustees assumed the duties then held by the Local 50 fund trustees. *See id.* at 231. It was in that context that Local 3 sought to have the portion of Local 50 welfare fund reserves representing Entenmann's past contributions transferred to the Local 3 fund. *See id.* at 232.

In reaching its conclusion that a transfer of reserves was required, the Court was influenced by the following equitable considerations. First, the case involved the rights of employees, not employers, to reap the benefits of employer contributions made in lieu of wages. *See id.* at 233. More importantly, however, that case involved a choice by employees to change their bargaining representative, a right "that strikes at the very core of collective representation." *Id.* The Court found that the absence of a provision for the transfer of an aliquot share of the reserves to the new fund could seriously interfere with the employees' right to choose their bargaining representative, a right protected by federal law, because absent such a transfer, an employee could only change unions at the cost of forfeiting payments

previously made on his behalf by his employer. *See id.* at 234.

The absence of those considerations requires a different result here. First, any transfer here would be for the primary benefit of the employers, not the employees.[9] It is undisputed that it was the employers who sought to create a new fund and that the employees, through their union, only agreed because the employers guaranteed to keep benefits at the same levels as under the former plans. Nowhere in section 302 or in ERISA, or the legislative history or case authorities construing either, is there any indication of a congressional intent to benefit employers. Thus, it would be in derogation of congressional intent to require a transfer when the effect of such transfer is to permit the *employers* to fund their promise to the union with assets from the old plan.

Moreover, this case does not present a situation where absent a transfer there would be a substantial interference with the free choice of a collective bargaining representative. *Cf. id.* at 233. Indeed, not only *Local 50*, but all of the other cases relied upon by plaintiffs involved either a change in collective bargaining representative or an *employee* decision to change plans. *See Local 50, supra*, 733 F.2d at 231; *Alvares, supra*, 514 F.2d at 159; *Trapani v. Consolidated Edison Employees*, 651 F.Supp. 400, 401–02 (S.D.N.Y.1987). In this case it is the employers who have chosen to create a new fund, even though their employees have remained in the same union, Local 144.

Although the employers claim that if assets are not transferred they will be forced to pay more into the fund or they will have to reduce benefits, that circumstance is the consequence of the obligation *they* assumed because *they* chose to create a new plan. It would indeed be anomalous to permit an employer to willingly assume obligations for its own purposes and then

---

9. Indeed, the only possible benefit to the employees would be to protect the employees against the circumstance that the employers

might not be financially able to honor their commitment pursuant to the collective bargaining agreement.

to use the financial pressures of that choice to force a transfer of assets from the plan from which it has chosen to withdraw. This Court therefore will not construe *Local 50* so as to compel that result.[10]

This is especially true since the union, which represented the employees, did not insist on a transfer of fund reserves as a condition to its agreement to permit the employers to set up the Southern Funds, but was satisfied with a commitment that benefit levels would not be reduced.[11] Thus, no rights of collective bargaining can be implicated where, as here, the union did collectively bargain and did not condition agreement to the Southern Funds on a transfer of assets.[12]

Furthermore, section 302(c)(5) is an exception to a criminal statute designed primarily to address the problem of corruption in labor unions. *See Arroyo v. United States*, 359 U.S. 419, 425–26, 79 S.Ct. 864, 868–69, 3 L.Ed.2d 915 (1959). Although that provision clearly furthers "other beneficial policies such as an employee's freedom to choose the collective bargaining representative he wants," *see Local 50, supra*, 733 F.2d at 236, in this case the transfer which is sought does not further policies related to the choice of collective bargaining representative, and there has been no allegation of corruption. There is thus no reason to find a structural defect in the Greater Welfare and Pension Plans on the facts of this case.[13]

10. Defendants here also argue that a transfer of assets would violate the Greater Funds trust agreements as well as section 403(c)(1) of ERISA, 29 U.S.C. § 1103(c)(1) (1982), because no employer has any right to assets of the plan except to provide benefits to plan beneficiaries and Southern employees are no longer beneficiaries of the Greater Funds. The Court cannot accept that argument. In fact, *Local 50* involved a situation in which assets of a fund were transferred to a new fund to benefit persons who were no longer beneficiaries of the old fund. *See Local 50, supra*, 733 F.2d at 234.

The argument that a transfer of assets violates ERISA because it would benefit the employers has more persuasive force although the Court need not decide that issue because it concludes for other reasons that the assets need not be transferred. In any event, any transferred assets would be held in trust and arguably would not directly benefit the employers. *See Holliday v. Xerox Corp.*, 732 F.2d 548, 550–51 (6th Cir.), *cert. denied*, 469 U.S. 917, 105 S.Ct. 294, 83 L.Ed.2d 229 (1984).

11. The union did agree that it would not object to the bringing of this action to the extent it would be consistent with applicable law, but that does not support an inference that the union agreed with the legal position of the Southern employers that a transfer of assets was mandated by law.

12. It is also significant that the result plaintiffs seek here could place an employer who wishes to break away from a multiemployer plan in an enhanced bargaining position because it would be assured of being able to take its share of contributions from a predecessor fund. It would appear, therefore, that construing the statute so as to require a transfer could tend to subvert the collective bargaining position of the union, and that, if anything, the equitable con-

siderations relied on in *Local 50* dictate the opposite result here.

13. Defendants argue that the result sought by plaintiffs is foreclosed by *United Mine Workers of America Health & Retirement Funds v. Robinson*, 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982), and that the *Local 50* Court misconstrued both *Robinson* and section 302(c)(5). The Court does not find these arguments persuasive.

In *Robinson*, the Court held only that a federal court could not test the reasonableness of a collectively bargained term under section 302(c)(5), so "long as such conditions do not violate federal law or policy." *See id.* at 574–75, 102 S.Ct. at 1233–34. Here, although the Greater Fund trust documents provide that no one may have rights to the funds except as specified in the plans and the plans have no provision regarding the transfer of assets, plaintiffs do not challenge the reasonableness of any provision, but instead argue the plans are violative of section 302(c)(5). *Robinson*, therefore, does not apply. *See Local 50, supra*, 733 F.2d at 236; *see also Chambless v. Masters, Mates & Pilots Pension Plan*, 772 F.2d 1032, 1040 (2d Cir.1985). In addition, defendants argue that in *Local 50* the Court incorrectly found that in *Robinson*, "the money retained by the trust fund redounded to the 'sole and exclusive benefit' of each contributing employer's employees." *See Local 50, supra*, 733 F.2d at 236. Defendants contend that the funds at issue in *Robinson* were pooled multiemployer funds which did not segregate out contributing employers' funds. However, in *Robinson* the money did inure to the "sole and exclusive benefit" of all contributing employers' employees because no one had left the fund. Moreover, the issue in *Robinson* was not whether the plan was unlawful for that reason but rather whether it was reasonable to distribute fund benefits among fund participants in the manner provided for in the plan. *See Robinson, supra*, 455 U.S. at 568, 102 S.Ct. at 1230.

The Court also rejects plaintiffs' argument that the Southern Funds, which are not parties here, have assumed the liabilities of the Greater Funds and that therefore the assets attributable to those liabilities must follow those liabilities. The Greater Funds never had any liability to accrue pension credit or provide welfare coverage for persons who had left the fund, and the Greater Pension Fund continues to provide pension benefits to those employees who have vested under the Greater Pension Plan.[14] While it is true that the Greater Welfare Plan no longer provides welfare coverage and the Greater Pension Plan no longer accrues service credits for the Southern employees, plaintiffs have not claimed and cannot claim that either of the Greater Funds ever had any obligation to provide benefits or accrue credit for persons who were no longer in the plan.

It is true that the Southern Pension Fund does recognize past years of service for those employees who had not vested under the Greater Pension Fund, but that was a decision made by the Southern Fund trustees after establishment of those funds. Moreover, an assumption of liability for welfare benefits and past service credit by the Southern Funds is not the same as a transfer of liabilities from the Greater Funds to them, since the latter implies that the Greater Funds had a preexisting obligation to those who left the plan, which is simply not the case here. The Court concludes therefore that there has been no transfer of liabilities from the Greater Funds to the Southern Funds.[15]

It is also significant to note that plaintiffs' claim for a transfer of assets from the Greater Pension Fund is clearly foreclosed by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 *et seq.* (1982). In these amendments, after a careful examination of issues relating to the funding of pension plans, Congress enacted a comprehensive statute regulating employer withdrawal from pension plans.[16] However, only one provision of these amendments, section 4235 of ERISA, mandates the transfer of assets and liabilities, and that is when "an employer has completely or partially withdrawn from a multiemployer plan ... as a result of a certified change of collective bargaining representative." *See* 29 U.S.C. § 1415 (Supp. IV 1986). Although there are several provisions dealing with the merger or transfer of plan assets or liabilities under MPPAA, in no other situation is a transfer of assets and liabilities mandated. *See* 29 U.S.C. §§ 1411–15.

Congress, therefore, has specifically determined that the only situation in which a pension plan must transfer assets and liabilities is when there has been a certified change in collective bargaining representa-

**14.** In fact, plaintiffs state that this is a liability that they will assume once the assets of the Greater Funds are transferred to them. *See* Plaintiff's Reply Memorandum of Law at 20 n. *.

**15.** In addition, under the definition of a transfer of liabilities under ERISA, there has not been a "diminution of ... liabilities with respect to [the Greater Funds] and ... the assumption of these liabilities by [the Southern Funds] ..." *See* 29 C.F.R. § 2670.3 (1987).

**16.** The Court does not accept the argument that MPPAA applies to all multiemployer plans, not just pension plans. In *Trustees v. Lith–O–Kraft Plate Co.,* 692 F.Supp. 782 (N.D.Ohio 1988), the Court held that Congress did not intend to impose withdrawal liability under MPPAA on employers withdrawing from a welfare fund. *See id.* at 787–88. The Court finds the reasoning of that case persuasive. Although the language of

the statute does refer to "multiemployer plans", the Court has been unable to find, nor has plaintiff cited, a case applying the MPPAA amendments to any plans other than pensions plans.

Similarly, in *T.I.M.E.—D.C., Inc. v. Management–Labor Welfare & Pension Funds, of Local 1730,* 756 F.2d 939 (2d Cir.1985), the Court stated that "[t]he goal of the withdrawal and transfer provisions of the MPPAA is to ensure that the employer covers its pension obligations in both the old and the new plans." *See id.* at 945–46; *see also New York State Teamsters Conference Pension & Retirement Fund v. McNicholas Transp. Co.,* 848 F.2d 20, 22 (2d Cir.1988). Moreover, the title of the Act and the legislative history of the amendments indicate that Congress sought to regulate multiemployer *pension* plans, not all multiemployer plans. *See* H.R. Rep. No. 869, 96th Cong., 2d Sess., pt. 1 at 51, *reprinted in* 1980 U.S.Code Cong. & Admin. News 2918, 2919.

tive.[17] Because Congress has specifically legislated in this area and has decided when a transfer of assets and liabilities is mandated, the Court should not and cannot expansively interpret LMRA section 302(c)(5) so as to accomplish that result. *Cf. Teamsters v. Daniels*, 439 U.S. 551, 569–70, 99 S.Ct. 790, 801–02, 58 L.Ed.2d 808 (1979). Indeed, as the Court of Appeals has noted, most of the problems created by employer withdrawal from multiemployer pension plans have been resolved by MPPAA. *See O'Hare v. General Marine Transp. Corp.*, 740 F.2d 160, 173 n. 8 (2d Cir.1984), *cert. denied*, 469 U.S. 1212, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985).

Therefore, for the reasons stated above, the Court concludes that the Greater Welfare Funds and the Greater Pension Funds are not structurally deficient under section 302(c)(5) and that plaintiffs' first claim must be dismissed.

## II. *ERISA*

### A. Asset Transfer Rules

■ Plaintiffs also claim that the Greater Funds are deficient for failing to adopt asset transfer rules pursuant to section 4234 of ERISA, 29 U.S.C. § 1414, and seek an order requiring the Greater Funds to adopt asset transfer rules.[18] It is undisputed here that the Greater Pension Fund does not have asset transfer rules.[19] *See* Plaintiffs' First Request for Admission of Facts at ¶¶ 6–7. However, even assuming arguendo that the Greater Pension Fund is deficient in failing to have asset transfer rules, under MPPAA plaintiffs must be

"adversely affected" by that omission. *See* Section 4301(a)(1) of ERISA, 29 U.S.C. § 1451(a)(1) (1982). Plaintiffs cannot meet that burden unless they can establish that a transfer pursuant to those asset transfer rules would inure to their benefit.[20] This they have failed to do. It follows that they lack standing to assert that claim.

Moreover, section 1414 does not address any situation except that in which a plan is transferring assets "in connection with the transfer of plan liabilities." Therefore, this section would be relevant to this case only if there had been a transfer of liabilities. Because the Court has concluded that there has been no transfer of liabilities from the Greater Funds to the Southern Funds, this section is inapplicable.

In addition, section 1414 applies only to a situation in which there is a transfer of assets in connection with a voluntary transfer of liabilities, not a transfer by operation of law. *See Vornado, Inc. v. Trustees of the Retail Store Employees' Union Local 1262*, 829 F.2d 416, 420–21 (3d Cir.1987). As stated *supra*, Congress clearly provided in 29 U.S.C. § 1415 for a situation in which a transfer of assets and liabilities would be mandated and there is no indication in the statute or its legislative history demonstrating that Congress intended to require a transfer of assets in any other situation unless there was a voluntary transfer of liabilities, which is clearly not the case here. *See* Views and Analysis of Senate Labor Committee on S. 1076, Benefits and Pension Reporter No. 288 (Apr. 28, 1980).

---

**17.** This congressional choice affords further support for the Court's view that *Local 50* should not be read as requiring a transfer for any purpose other than protecting the freedom of employees in selecting their collective bargaining representative.

**18.** 29 U.S.C. § 1414(a) provides in pertinent part:
A transfer of assets from a multiemployer plan to another plan shall comply with asset-transfer rules which shall be adopted by the multiemployer plan and which
  (1) do not unreasonably restrict the transfer of plan assets in connection with the transfer of plan liabilities, and
  (2) operate and are applied uniformly with respect to each proposed transfer, except that

the rules may provide for reasonable variations taking into account the potential financial impact of a proposed transfer on the multiemployer plan.

**19.** As stated *supra* at note 16, the Court does not accept the argument that the MPPAA amendments were intended to apply to all multiemployer plans rather than only pension plans.

**20.** Plaintiffs have not argued that section 1414 itself would require the transfer. Instead, they argue that *Local 50* requires the transfer and that rules adopted pursuant to section 1414 would effectuate the transfer. *See* Plaintiffs' Reply Memorandum of Law at 25.

Moreover, MPPAA emphasized the interests of plan beneficiaries and the Pension Benefit Guaranty Corporation and was not designed to increase the power of contributing employers. *See Vornado, supra,* 829 F.2d at 420. Here, the result sought by plaintiffs would increase the power of contributing employers by forcing a transfer of assets to a new fund they wished to create.

### B. Breach of Fiduciary Duty

Plaintiff employees also allege that defendants have violated their fiduciary duty under section 404 of ERISA, 29 U.S.C. § 1104, for failing to administer the trust documents in accordance with ERISA by failing to adopt asset transfer rules and for treating the Southern employees differently from those employees still in the Greater Funds by failing to transfer an aliquot share of assets. The Court has already determined that the Greater Funds are not structurally deficient under section 302(c)(5) and that any failure of the Greater Pension Fund to have asset transfer rules would not aggrieve these plaintiffs. It follows that the trustees have not violated any fiduciary duty owed to plaintiffs in refusing to transfer assets pursuant to section 302(c)(5). Therefore, plaintiffs' claim for a breach of fiduciary duty must be dismissed.

### CONCLUSION

For the reasons set forth above, plaintiffs' motion for partial summary judgment on the main claim is denied; defendants' motion for summary judgment on the section 302 claim is granted; defendants' motion to dismiss the section 1414 claim for lack of standing is granted; and defendants' motion for summary judgment on the section 404 claim is granted.

It is SO ORDERED.