Ronald W. CATERINO, et al.,
Plaintiffs,

v.

J. Leo BARRY, et al., Defendants.

Civ. A. No. 86-3690-H.

United States District Court,
D. Massachusetts.

April 19, 1991.

Anthony M. Feeherry, Goodwin, Procter & Hoar, Boston, Mass., for plaintiffs.

James T. Grady, Grady and Dwyec, Randall E. Nash, Boston, Mass., for defendants.

MEMORANDUM AND ORDER

HARRINGTON, District Judge.

STATEMENT OF THE CASE

The plaintiffs are employees of United Parcel Service, Inc. ("UPS"), and are participants in the New England Teamsters and Trucking Industry Pension Fund ("the Fund") and in the New England Teamsters and Trucking Industry Pension Plan ("the Plan"). The defendants are the Trustees of the Fund. The law suit has been certified as a class action. The current Trustees are William J. McCarthy (co-chairman), David W. Laughton, Edward Brereton, Ernest Tusino, J. Leo Barry (co-chairman), John J. McCarthy, John R. West and William M. Clifford. The plaintiffs ultimately seek declaratory and injunctive relief. The complaint alleges violations of the Employee Retirement Income Security Act ("ERISA") and the Labor–Management Relations Act ("LMRA"). The plaintiffs claim that the defendants, in their capacities as the Trustees of the Fund, have violated provisions of ERISA and the LMRA by (1) failing to amend the Plan to provide adequate benefits under the Plan to the plaintiffs and the class they represent, and (2) by failing to amend the Plan to allow the assets and liabilities of the Plan attributable to plaintiffs and the class they represent to be spun-off to a separate pension plan upon negotiation of a collective bargaining agreement providing for future coverage of plaintiff and their class under such plan.

JOINT STIPULATION OF UNDISPUTED FACTS

*The Fund*

1. The Fund is a trust established by an Agreement and Declaration of Trust originally dated April 11, 1958. A copy of the Original Declaration of Trust, including amendments thereto adopted prior to August 2, 1982, has been marked as a Trial Exhibit (the "Original Declaration of Trust"). Under Section 1 of Article X of the Original Declaration of Trust, the Trustees had the exclusive authority to amend the Original Declaration of Trust, in their discretion.

2. The Original Declaration of Trust was restated by a document executed by the Trustees and effective August 2, 1982 (the "Restated Declaration of Trust"). A true copy of the Restated Declaration of Trust has been marked as a Trial Exhibit. (The Original Declaration of Trust and the Restated Declaration of Trust are sometimes collectively referred to herein as the "Declaration of Trust.") Under Section 1 of Article X of the Restated Declaration of Trust, the Trustees have the exclusive authority to amend the Restated Declaration of Trust, in their discretion. Such an amendment is made upon affirmative vote of at least three Trustees designated as union trustees and three Trustees designated as employer trustees.

3. The Fund is subject to the requirements of Section 302(c)(5) of the Labor–Management Relations Act, 29 U.S.C. § 186(c)(5), and the requirements of Part 4 of Subtitle B of Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1101–1112.

4. The Fund is and always has been managed and administered by a Board of Trustees consisting of eight Trustees.

5. Four of the Trustees are designated "employer trustees." The original employer trustees were appointed by employers subject to collective bargaining agreements requiring contributions to the Fund. If there is a vacancy among the employer trustees, a successor employer trustee is appointed by the Employers Group of Motor Freight Carriers, Inc., or its successor.

6. The other four Trustees are designated "union trustees." The original union trustees were appointed by local unions affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO (the "IBT"). If there is a vacancy among the union trustees, a successor union trustee is appointed by a majority vote of the remaining union trustees. Union trustees must be duly elected officers or business agents of local unions affiliated with the IBT (the "Local Unions").

*The Plan*

7. Under Section 3(a) of Article IV of the Original Declaration of and the Restated Declaration of Trust, the Trustees have been and are empowered to establish and administer the Plan.

8. The Trustees are, collectively, the "administrator" of the Plan, within the meaning of Section 3(16)(A)(i) of ERISA, 29 U.S.C. § 1002(16)(A)(i). The Plan is administered from the Fund's principal office at 535 Boylston Street, Boston, Massachusetts 02116.

9. Pursuant to the authority described in paragraph 4 above, the Trustees have established and administered the Plan.

10. The Plan is a "pension plan," within the meaning of Section 3(2) of ERISA, 29 U.S.C. § 1002(2). The Plan is a "multi-employer plan" within the meaning of Sections 3(37) and 4001(a)(3) of ERISA. The Plan is a "defined benefit pension plan" within the meaning of Section 3(35) of ERISA, 29 U.S.C. § 1002(35). A true copy of the Plan, as in effect as of October 30, 1985 (the "1985 Plan") and as amended to date has been marked as a Trial Exhibit.

11. The following are the only amendments to the Plan which have been adopted by the Trustees since October 30, 1985, and such amendments have been marked as Trial Exhibits.

    a. As of January 1, 1987, all participants in the Plan retiring on or after January 1, 1988 will receive a benefit based on two separate calculations. The total retirement benefit will be the sum of the benefits earned under the "old" accrual method (through December 31, 1986) and the benefits earned under the "new" accrual method beginning January 1, 1987. This amendment is reflected in a booklet distributed by the Fund office to all participants, and has been marked as a Trial Exhibit.

    b. As of October 1, 1989, any participant with 30 years of contributory service may retire at any age and receive the maximum benefit formerly payable only at age 60 or after. This amendment is reflected in a flyer distributed by the Fund office to all participants, and has been marked as a Trial Exhibit; and

    c. As of October 1, 1990, the Plan provides for full vesting after five (5) years of contributing service.

12. The 1985 Plan and amendments that constitute Trial Exhibits determine the times that benefits are payable from the Fund to participants in the Plan (and their beneficiaries) and the amounts of those benefits.

13. All of the assets of the Plan are held in the Fund.

14. Under Article VI, Section 5 of the Trust Agreement and Section 11.01 of the Plan, the Trustees have exclusive discretionary authority to amend the Plan.

15. Under Section 1 of Article VI of the Trust Agreement, the Trustees have the exclusive discretionary authority to determine the nature, amount, and duration of the benefits provided under the Plan.

*Other Relevant Facts*

16. In exercising their discretionary authority to propose, consider, adopt, or to decide not to adopt amendments to the Declaration of Trust and the Plan, the Trustees have acted as "fiduciaries" of the Plan and Trust, within the meaning of Section 3(21) of ERISA, and their conduct in that regard is subject to the requirements of Part 4 of Subtitle B of Title I of ERISA, 29 U.S.C. §§ 1101–1112.

17. Eligibility for participation in the Plan is limited to employees (the "Covered Employees") covered under collective bargaining agreements (the "Collective Bargaining Agreements") between their employers (the "Signatory Employers") and various Local Unions affiliated with IBT, which agreements require each such employer to contribute to the Fund at a negotiated rate on account of hours worked by its Covered Employees.

18. The Collective Bargaining Agreements determine the amount which a Signatory Employer is required to contribute to the Fund. The Collective Bargaining Agreements do not specify the amount of

benefits to be paid by the Fund to Covered Employees who become participants in the Plan.

19. The Plan describes a number of rates (the "Contribution Rates") at which Signatory Employers contribute to the Fund on account of hours worked by their Covered Employees, in accordance with the terms of the respective Collective Bargaining Agreements to which such Signatory Employers are signatory.

20. UPS has been a Signatory Employer since the establishment of the Fund in 1958 and has generally contributed to the Fund at the highest Contribution Rate described in the Plan, except as indicated on Exhibit C attached hereto. The contribution rates for relevant times are reflected in documents marked as trial exhibits.

21. Pursuant to its Collective Bargaining Agreement, UPS currently contributes $2.11 to the Fund on account of each hour worked by its Covered Employees. With one exception, this rate is the highest Contribution Rate currently described in the Plan.

22. Pursuant to their authority described in paragraph 15 above, the Trustees have established schedules of retirement benefit amounts (the "Benefit Schedules") payable under the Plan.

23. Under the Benefit Schedules, the monthly retirement benefit payable to an eligible participant under the Plan is determined by four factors: the Contribution Rate of the Signatory Employer for whom the participant last worked, the participant's age, the participant's years of credited service, and whether or not the participant has elected the spouse/survivor option.

24. The benefit schedules for relevant times are reflected in documents marked as trial exhibits.

25. The benefits payable under the Plan to and in respect of participants employed by UPS are and have always been determined in the same way as benefits for participants employed by any other Signatory Employer who contributes at the same Rate as UPS.

26. In establishing and amending the Plan's provisions for determining benefits, the Trustees have not considered whether the participants employed by UPS, as a group, have any actuarial or other characteristics which would justify a benefit level for such UPS participants different from the benefit level generally applicable to participants employed by other Signatory Employers contributing at UPS' contribution rate.

27. The Restated Declaration of Trust, Article XII, Section 9, affirmatively prohibits a transfer of assets and liabilities to another plan if an employee or group of employees ceases to be covered by the Fund.

28. The information contained in the letter of Helen Debrecini, attached hereto as Exhibit A, is true and accurate in its content.

29. The information contained in the letter of Charles Langone, attached hereto as Exhibit B, is true and accurate in its content.

30. In connection with discovery in this matter, the Trustees have supplied plaintiffs' designated expert, Walter Browne of John Hancock Mutual Life Insurance Company, with a computer tape containing census data for fund participants. The information and data contained on that computer tape are accurate and true.

FINDINGS OF FACT

1. The age, term of past service and entry age of pension fund participants are actuarially significant characteristics because they affect the amount of future contributions that will be made on account of hours worked by such participants and the amount of time over which such contributions will accumulate earnings. The younger a participant, the shorter his term of past service and the younger his entry age, the more years of future contributions will flow into the fund on account of hours worked by that participant and the more years such contributions will have to accumulate earnings.

2. As a group, the UPS participants are younger than other fund participants: as

of October 1, 1990, the UPS participants were 36.4 years of age on average; the non-UPS participants were 45.5 years on average; and all fund participants, including UPS, were 44 years on average. The UPS participants' comparative youth is actuarially significant.

3. As a group, the UPS participants have a shorter term of past service than other fund participants: as of October 1, 1990, the UPS participants averaged 9.7 years of past service; the non-UPS participants averaged 16.6 years of past service; and all fund participants, including UPS, averaged 15.5 years of past service. The UPS participants shorter term of past service is actuarially significant.

4. As a group, the UPS participants have a younger entry age than other fund participants: as of October 1, 1986, the UPS participants had an average entry age of 25.5 years; the non-UPS participants had an average entry age of 29.0 years; and all fund participants, had an average entry age of 28.5 years. The UPS participants younger entry age is actuarially significant.

5. The part-time status of a fund participant is also an actuarially favorable characteristic because a part-time participant is more likely to terminate employment without collecting benefits, even though contributions have been made on account of hours worked by that employee.

6. As a group, the UPS participants have a large percentage of part-time employees. As of October 1, 1988, for example, UPS had 2,374 part-time employees. The larger number of UPS part-time employees is actuarially significant.

7. The size of a class of beneficiaries is an actuarially significant factor because it increases the impact of that class' actuarial characteristics on the fund.

8. Here, the UPS participants have experienced a 56 percent increase in numbers between 1977 and 1990. By contrast, all plan participants, including UPS, have experienced a 20 percent decrease and non-UPS participants have experienced a 26 percent decrease. The numerical strength of the UPS group is actuarially significant.

9. Contributions on account of hours worked by UPS participants also represent an increasing proportion of all contributions to the fund: since 1987, UPS contributions as a percentage of total contributions to the Fund have increased from 16.7 percent in 1987 to 22 percent in 1990.

10. Hours worked by UPS employees also represent an increasing proportion of all hours worked in the Fund. Total hours worked in the fund have declined from 82.3 million hours in 1985 to 77.3 million hours in 1990. During this same period, UPS hours have increased from 10.7 million hours in 1985 to 14.6 million hours in 1990. UPS hours have also increased a percentage of total hours from 13.0 percent in 1985 to 18.9 percent in 1990.

11. The UPS Fund participants have more favorable actuarial characteristics than all other fund participants because, on average:

  a. The UPS Fund participants are significantly younger;

  b. The UPS Fund participants have a significantly shorter term of past service;

  c. The UPS Fund participants have a significantly younger entry age;

  d. UPS Fund participants have a substantial number of part-time employees; and

  e. hours worked by UPS Fund participants and contributions made on account of those hours represent an increasing proportion of the Fund.

12. In 1986, when this lawsuit was filed, the highest benefit level available to UPS Fund participants was approximately $900 per month.

13. In 1986, when this lawsuit was filed, the UPS contribution rate was $1.66 per hour.

14. The amount of contribution actually required to fund the UPS benefit level of $900 a month was between 63.7¢ per hour and 68.1¢ per hour.

15. A contribution rate of approximately $1.66 per hour (the rate at which UPS contributed in 1986) could have supported a

benefit level of $2,600 for UPS Fund participants.

16. The essential nature of a Multi–Employer Pension Plan is the "pooling" of assets, risks, investment gains and losses, mortality experience, cost and administration of plan, costs of pension benefits, and costs of death benefits.

17. In a Multi–Employer Plan, where the employers come from various industries, this "pooling" arrangement insulates participant employers and their employees from the detrimental effects of changes in the economy. When one employer or industry is doing well financially, another might be doing poorly, yet the Fund remains stable. If the one employer or industry suffers a sudden economic setback, others will be available to maintain the security of the Fund. The basic principle of a Multi–Employer Plan is the sharing of the risks to insure the security of the Fund.

18. Different contributing employers may have so-called "favorable actuarial characteristics" at various points in time. These "favorable actuarial characteristics" are beneficial to the Pension Plan, or any pension plan, because they tend to decrease the cost of providing benefits to that particular group. The beneficial effect of these particular employers' "favorable actuarial characteristics," like all other assets which a participating employer contributes to the Fund, is "pooled" for the benefit of all of the beneficiaries of the Pension Plan. As with an employer's financial condition, an employer's "favorable actuarial characteristics" may change over time becoming less favorable. Other employer groups with more "favorable actuarial characteristics" will be available to maintain the stability of the Fund.

19. The basic principle underlying the longterm success and financial stability of a Multi–Employer Plan lies in each contributing employer's willingness to pool its individual assets with the assets of all the other contributing employers for the good of the whole.

20. The aggregation of funds as a result of the "pooling" of contributions and assets leads to a greater diversity in investment opportunity and thus to greater opportunity for profit for the Fund.

21. A separate benefit level for one employer group within the Fund would change the character of the Multi–Employer Plan, as it would be contrary to the essential nature of "pooling" of cost of pension benefits. The setting of pension benefit levels is determined on an equal basis in accordance with the negotiated contribution rate paid by the employer.

22. A separate benefit level for UPS employees within the Fund would be divisive, for to allocate a greater portion of the assets of the Fund to benefit one employer group, would leave less assets for allocation to the non-UPS employees. It would then reasonably lead to other employer groups seeking similar treatment to the ultimate disintegration of the Fund.

23. The transfer of assets from the Fund would tend to diminish the assets of the Fund and the Fund could foreseeably be comprised of only employer groups with "less favorable actuarial characteristics" to the ultimate depletion of the assets of the Fund. This would be so even if these employer groups with "less favorable characteristics" had at one time themselves had "more favorable actuarial characteristics" in the past.

24. The withdrawal of an employer group from the Fund is accomplished only by collective bargaining and no agreement has been reached on the issue of UPS' withdrawal from the Fund.

25. No other Multi–Employer Teamster Pension Fund has a preferential pension benefit level for an individual employer group.

26. There is one "multiple" employer pension fund in the country in which every employer group has a separate benefit level. This fund is a nationwide fund which was specially established to encompass employers with a small number of employees.

ISSUES TO BE TRIED

The parties have stipulated to the following two issues to be resolved:

1. Have the Trustees acted contrary to applicable laws by failing to set a separate benefit for UPS Plan participants?

2. Have the Trustees acted contrary to applicable laws by failing to amend the relevant Declaration of Trust to allow the transfer of assets and liabilities to a separate plan?

These issues deal only with the liability of the defendants. If necessary, the Court shall decide the appropriate remedy at a separate hearing.

## STANDARD OF REVIEW

### A. *Setting of Benefit Levels*

██ In judging decisions made by trustees in the course of managing an employment benefit plan, the Court's inquiry is limited to determining whether the decisions were arbitrary and capricious in light of the trustees' responsibility to all potential beneficiaries. *Cleary v. Graphic Communications Intern. Union*, 841 F.2d 444, 449 (1st Cir.1988); *Govoni v. Bricklayers, Masons & Plasterers Int'l. Union of America, Local No. 5 Pension Fund*, 732 F.2d 250, 252 (1st Cir.1984); *Palino v. Casey*, 664 F.2d 854, 858 (1st Cir.1981). Generally speaking, trustees are knowledgeable of the details of a trust fund (both its purpose and its operation), and thus they are in a position to make prudent judgments concerning the level of participant benefits. Courts are extremely reluctant to substitute their judgment for that of the Trustees, and will do so only if the Trustees' actions are not grounded on any reasonable basis. It is for the Trustees, not judges, to choose between various reasonable alternatives. *See Ponce v. Const. Laborers Pension Trust*, 628 F.2d 537, 542 (9th Cir.1980); *Roark v. Lewis*, 401 F.2d 425, 429 (D.C.Cir.1968).

### B. *Transfer of Assets*

Section 4234(a) of ERISA provides in pertinent part:

A transfer of assets from a multiemployer plan to another plan shall comply with asset-transfer rules which shall be adopted by the multiemployer plan and which—

(1) do not unreasonably restrict the transfer of plan assets *in connection with* the transfer of plan liabilities, and

(2) operate and are applied uniformly to each proposed transfer, except that the rules may provide for reasonable variations taking into account the potential financial impact of a proposed transfer on the multiemployer plan.

29 U.S.C. § 1414(a) (emphasis added).

██ This section of ERISA does not require the Trustees to establish rules which would require the transfer of assets and liabilities from a multi-employer plan to a single employer plan upon a withdrawing employer's request. All that is required is that, *if* there is a transfer of liabilities, the rules regarding transfer must be applied uniformly and cannot unreasonably restrict a concomitant transfer of assets. *Vornado, Inc. v. Retail Store Employees' Union Local 1262, et al.*, 829 F.2d 416, 418–419 (3d Cir.1987).

ERISA clearly does not mandate transfers at the instance of employers. A requirement that the Trustees transfer assets under circumstances where such a transfer might prove disadvantageous to the Fund is inconsistent with the Trustees' fiduciary duties to act in the best interest of all members of the Fund. Rather, the possibility of a transfer of liabilities, with a concomitant transfer of assets, is left to the discretion of the Trustees, acting in accordance with their fiduciary obligations and the statutory requirements. *Vornado*, 829 F.2d at 421.

Congress has specifically determined that the only situation in which a pension plan *must* transfer assets and liabilities is when there has been a certified change in collective bargaining representative. *Demisay v. Local 144, Nursing Home Pension Fund*, 710 F.Supp. 58, 66 (S.D.N.Y.1989). Moreover, Section 4234(a) of ERISA does not address any situation except that in which a plan is transferring assets "in connection with the transfer of plan liabilities." *Id.* Therefore, this section would be relevant to this case only if there has been

a transfer of liabilities, which has not occurred here. *Demisay*, 710 F.Supp. at 66. *See* Findings of Fact, Paragraph 24, *supra*.

■ Assuming, however, that Section 4234(a) applies to this case and that the Trustees must act according to its mandate, the Trustees would still be required to refrain from "arbitrary and capricious" conduct in determining whether to amend the Fund document to allow for the transfer of assets. *Cleary v. Graphic Communications International Union, supra,* at 449. Moreover, in deciding (1) whether to allow the transfer of liabilities, and, if so, then (2) whether to permit a concomitant transfer of assets, the trustees must always consider the welfare of the Fund and the beneficiaries.

## DECISION

■ A trust, validly established and voluntarily entered into, which grants exclusive discretion to the trustees to administer it, should not be tampered with by any court, unless there has been an abuse of that discretion and the trustees have acted in an arbitrary and capricious manner. For courts must be very reluctant to interfere with consensual arrangements created to govern narrow and highly specialized areas of life which require technical expertise and skill to insure their prudent administration.

It is the judgment of this Court that the Trustees did not act in an arbitrary and capricious manner by failing to set a separate benefit for UPS Plan participants and by failing to amend the relevant Declaration of Trust to allow the transfer of assets and liabilities to a separate, single employer plan. There was a "reasonable basis" for the Trustees' failure to act in the manner the Plaintiffs demand. The Court's Findings of Fact, Paragraphs 16 through 26, provide that "reasonable basis" for the Trustees' failure to act as demanded by Plaintiffs. The Trustees have acted to support the basic principle underlying the long-term success and financial stability of a multi-employer plan which lies in each contributing employer's willingness to pool its individual assets with the assets of all the other contributing employers and to share the risks to insure the security of the Fund for the good of the whole. The Trustees have acted in a rational belief that the setting of a separate benefit for UPS Plan participants or the amending the relevant Declaration of Trust to allow the transfer of assets and liabilities to a separate plan would be detrimental to the interests of the Fund and all its beneficiaries.

If any such fundamental change is to be made to the essential nature of this pooling-type Fund it should be accomplished by the political process within the union itself and then by collective bargaining with the employer and not be imposed from the outside by judicial fiat. Voluntary arrangements should be amended by consent of the parties and not by legal compulsion.

Judgment for the Defendants. SO ORDERED.

## EXHIBIT A

June 7, 1989

Gerard F. Daley, Esq.
Grady and Dwyer
One Center Plaza
Boston, MA 02108

MAY 5 4 PHOSTON

DISTRICT MASS

PLAINTIFF'S
EXHIBIT
26

Dear Gerry:

Re: Caterino v. Barry

As you requested in your May 25th letter, I am providing below the answers to Attorney Feeherry's 5/11/89 request for information:

1. You indicated that you would provide the 1988 valuation.

2. There were 4,618 fulltime active UPS employees as of 10/1/88 — picked up only employees marked with "F" by UPS. In addition, there were —
   142 not marked fulltime but had more than 1,600 hours
   2,232 not marked fulltime but had year of Vesting

3. Contributions to Fund by UPS were $19,644,101.08 for fiscal year 10/86-9/87 and $24,662,380.39 for fiscal year 10/87-9/88.

4. Total hours worked by covered UPS employees — 13,691,484
   7,500,684 with $1.81 contribution rate
   6,190,800 with $1.91 contribution rate

5. There were 383 terminated vested UPS participants as of 9/30/86. Please note that of these, some are vested for Statutory and some for regular types of pensions.

6. There were 31 retired UPS participants as of 9/30/86. Please note that included in this number are surviving spouses and beneficiaries.

   The number given for 1987 in our 2/9/89 letter was also 31; this represented only active pensioners. In addition, there were 15 widows or beneficiaries receiving pension in 1987 — for a total of 46.

7. Total contributions to Fund for all employers were —
   Calendar year 1987 = $117,693,278
   Calendar year 1988 = $127,122,611

Enclosed, as requested, are excerpts from the minutes of Trustee meetings between 12/87 and 3/89. Would you kindly review these before forwarding to the plaintiff's attorney. Please note that approval of the March, 1989, minutes were tabled for the August meeting; at the present time, they are considered not approved. The latest benefit booklet WE'RE ON THE ROAD WITH BETTER RETIREMENT BENEFITS is also included herein.

Please let me know if you have any questions.

Very truly yours,

Helen Debreceni

NEW ENGLAND
TEAMSTERS &
TRUCKING INDUSTRY
PENSION FUND

535 Boylston Street
Boston, Massachusetts 02116
617-266-8900

"Advice about claims, bene-
fits, eligibility or status of
participants is based on the
present rules of the Fund
which are subject to change
without notice."

# EXHIBIT B

## NEW ENGLAND TEAMSTERS & TRUCKING INDUSTRY PENSION FUND

535 BOYLSTON STREET • BOSTON, MASSACHUSETTS 02116-3770
TELEPHONE 617-266-8900 • FAX 617-247-8188
TOLL FREE TELEPHONE NUMBERS: MASS. ONLY ► 800-322-1216 • OUT OF STATE ► 800-447-7709

March 5, 1991

PLAINTIFF'S
EXHIBIT
27

Randall E. Nash, Esq.
Grady and Dwyer, P. C.
Two Center Plaza
Boston, MA 02108

Re: Caterino Case

Dear Randy:

In response to Attorney Feeherry's letter dated March 1, 1991, please be advised as follows:

1) UPS contributions for year ending 9/30/90 = $28,527,678

2) UPS hours for year ending 9/30/90 = 14,578,933

3) UPS employees included in the 38,785 total = 6,274

4) Average age/service of above UPS employees:

          average age = 36.4 years
          average credit = 9.7 years

If you have any questions on the above or if additional information is necessary, please do not hesitate to call me.

Very truly yours,

Charles Langone
Fund Manager

CL:B

"Advice about claims, benefits, eligibility or status of participants is based on the present rules of the Fund which are subject to change without notice."

# EXHIBIT C

## COMPARISON OF CONTRIBUTION RATES

| B.F.S. RATE | DATE | NEFA RATE | DATE | CONN. CONST. RATE | DATE | MASS. CONST. RATE | DATE | R.I. CONST. RATE | DATE | CAPITAL DIST. (42-156) RATE | DATE | TAYLOR OIL N.E. (379-409?) RATE | DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| .65 | 4/11/76 | .65 | 4/1/76 | | | | | | | | | | |
| .72½ | 5/77 | .72½ | 4/77 | | | | | .72½ | 4/77 | | | | |
| .80 | 5/78 | .80 | 4/78 | | | | | .80 | 4/78 | | | | |
| 1.00 | 5/79 | 1.00 | 4/79 | | | | | | | | | | |
| 1.10 | 5/80 | 1.10 | 4/80 | | | | | 1.10 | 4/80 | | | | |
| 1.20 | 5/81 | 1.20 | 4/81 | | | | | 1.20 | 4/81 | | | | |
| 1.30 | 5/82 | 1.30 | 4/82 | | | | | | | | | | |
| 1.41 | 5/83 | 1.41 | 4/83 | | | | | | | | | | |
| 1.56 | 5/84 | 1.56 | 4/84 | | | | | | | | | | |
| 1.61 | 9/85 | 1.61 | 4/85 | 1.61 | 5/85 | 1.61 | 5/85 | 1.61 | 5/85 | 1.61 | 7/85 | | |
| 1.66 | 9/86 | 1.66 | 4/86 | 1.66 | 5/86 | 1.66 / 1.71 | 5/86 / 11/86 | 1.66 | 5/86 | 1.65 | 7/86 | | |
| 1.81 | 8/87 | 1.71 | 4/87 | 1.71 | 5/87 | | | 1.71 | 5/87 | 1.71 | 7/87 | | |
| 1.91 | 8/88 | 1.86 | 4/88 | 1.86 | 5/88 | 1.85 | 4/88 | 1.86 | 5/88 | 1.86 | 7/88 | | |
| 2.01 | 8/89 | 1.96 | 4/89 | 1.96 | 5/89 | 1.96 | 4/89 | 1.96 | 5/89 | 1.96 / 2.05 | 7/89 / 7/89 | | |
| 2.11 | 8/90 | 2.05 | 4/90 | 2.06 | 5/90 | 2.06 | 6/90 | 2.06 | 5/90 | 2.21 | 7/90 | 2.05 | 4/90 |
| 2.21 | 8/91 | | | 2.16 | 5/91 | | | | | 2.16 | 7/91 | 2.16 | 4/91 |
| 2.31 | 8/92 | | | 2.26 | 5/92 | | | | | 2.51 | 7/92 | 2.26 | 4/92 |

GRADY AND DWYER