## LOCAL 144 NURSING HOME PENSION FUND
### ET AL. *v.* DEMISAY ET AL.

No. 91–610.   Argued January 11, 1993—Decided June 14, 1993

*Henry Rose* argued the cause for petitioners. With him on the briefs was *Linda E. Rosenzweig.*

*Ronald E. Richman* argued the cause for respondents. With him on the brief were *Mark E. Brossman* and *Eileen M. Fields.**

JUSTICE SCALIA delivered the opinion of the Court.

This case presents the question whether a federal district court may issue an injunction pursuant to §302 of the Labor Management Relations Act, 1947 (LMRA), 61 Stat. 157, as amended, 29 U. S. C. §186 (1988 ed. and Supp. III), requiring the trustees of a multiemployer trust fund to transfer assets from that fund to a new multiemployer trust fund established by employers who broke away from the first fund.

I

Respondents include a group of employers that, until 1981, were members of a multiemployer bargaining association, the Greater New York Health Care Facilities Association, Inc. (Greater Employer Association). Two trust funds—the

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Starr, Christopher J. Wright, Ronald J. Mann, Allen H. Feldman, Mark S. Flynn, Carol Connor Flowe,* and *Jeffrey B. Cohen;* for the Central States, Southeast and Southwest Areas Health and Welfare and Pension Funds by *Thomas C. Nyhan* and *Terence G. Craig;* for the National Coordinating Committee for Multiemployer Plans by *Gerald M. Feder* and *David R. Levin;* and for the Western Conference of Teamsters Pension Trust Fund by *Robert M. Westberg* and *Kirke M. Hasson.*

Local 144 Nursing Home Pension Fund and the New York City Nursing Home-Local 144 Welfare Fund (collectively, Greater Funds)—were established pursuant to collective-bargaining agreements between the Greater Employer Association and the relevant union, Local 144 of the Hotel, Hospital, Nursing Home and Allied Services Employees Union, Service Employees International Union, AFL–CIO (Local 144). Prior to 1981, the respondent employers made contributions to the Greater Funds on behalf of their employees in accordance with the terms of collective-bargaining agreements negotiated between the Greater Employer Association and Local 144.

In 1981, the respondent employers broke away from the Greater Employer Association and executed independent collective-bargaining agreements with Local 144. The initial agreements required continuing employer contributions to the Greater Funds, but those concluded in 1984 provided for establishment of a new set of trust funds, the Local 144 Southern New York Residential Health Care Facilities Association Pension Fund and the Local 144 Southern New York Residential Health Care Facilities Association Welfare Fund (Southern Funds). At approximately the same time, the respondent employers ended their participation in the Greater Funds.

In negotiating the transfer from the Greater Funds to the Southern Funds, the "primary concern" of Local 144 was to make sure that the shift would not cause its members to lose benefits. 935 F. 2d 528, 530 (CA2 1991). To address that concern, the respondent employers guaranteed in their collective-bargaining agreements that the Southern Funds would recognize all credited service time earned under the Greater Funds and, more generally, that employees would not lose any benefits as a result of the withdrawal from the Greater Funds. See 710 F. Supp. 58, 60–61 (SDNY 1989). That guarantee obviously created some peculiar liabilities for the Southern Funds. For example, an employee who had earned nine years' credited service time under the Greater

Funds would, after just one more year of service, acquire vested rights to pension benefits pursuant to the 10-year vesting requirement of the Southern Funds—even though the Southern Funds had received only one year of employer contributions for that employee. See *id.*, at 61, n. 4. The Southern Funds' assumption of these liabilities, however, did not alter the obligations of the Greater Funds, which were not parties to the collective-bargaining agreements: They remained liable to the departing employees for all vested benefits. See *id.*, at 61, and n. 5, 65; 935 F. 2d, at 530–531.

To help cover the Southern Funds' liabilities and in general to help finance the change from the Greater Funds to the Southern Funds, the respondent employers—joined by several of their employees and the trustees of the Southern Funds—brought this action to compel petitioners, the Greater Funds and the Greater Funds' trustees, to transfer an appropriate fractional share of the Greater Funds' assets to the Southern Funds. They asserted right to relief under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U. S. C. § 1001 *et seq.* (1988 ed. and Supp. III), and under § 302 of the LMRA; only the latter claim is at issue here.

The relevant portions of § 302 are set forth in the margin.[1] To describe respondents' claim, it is necessary to sketch

---

[1] Section 302, 29 U. S. C. § 186 (1988 ed. and Supp. III), provides in part:

"(a) ... It shall be unlawful for any employer or association of employers ... to pay, lend, or deliver ... any money or other thing of value—

"(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

"(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer ... ;

. . . . .

"(b) . . . (1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or

the structure of that provision. Subsection (a) prohibits an employer (or an association of employers, such as the Greater Employer Association) from, *inter alia,* making payments to any representative of its employees, including the employees' union and union officials. Paragraph (b)(1) is the "reciprocal" of subsection (a), *Arroyo* v. *United States,* 359 U. S. 419, 423 (1959), making it unlawful for employee representatives to receive the payments prohibited by subsection (a). The prohibitions of subsection (a) and paragraph (b)(1) are drawn broadly and would prevent payments to union employee health and welfare funds such as those at issue here. See generally *United States* v. *Ryan,* 350 U. S. 299, 304–305 (1956); Goetz, Employee Benefit Trusts under Section 302

---

delivery of any money or other thing of value prohibited by subsection (a) of this section.

. . . . .

"(c) . . . The provisions of this section shall not be applicable . . . (5) with respect to money or other thing of value paid to a trust fund established by [the representative of the employees], for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided,* That (A) such payments are held in trust for the purpose of paying . . . for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, . . . (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer . . . ; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities; . . .

. . . . .

"(e) The district courts of the United States and the United States courts of the Territories and possessions shall have jurisdiction, for cause shown, and subject to the provisions of section 381 of title 28 (relating to notice to opposite party) to restrain violations of this section, without regard to the provisions of section 17 of title 15 and section 52 of this title, and the provisions of chapter 6 of this title."

of Labor Management Relations Act, 59 Nw. U. L. Rev. 719, 723–731 (1965). Subsection 302(c), however, provides exceptions to the prohibitions. Most significantly for our purposes, paragraph (c)(5) excepts payments to an employee trust fund so long as certain conditions are met, including that the trust fund be "established . . . for the sole and exclusive benefit of the employees," and that the payments be "held in trust for the purpose of paying" employee benefits.

Respondents' theory is that the Greater Funds cannot meet those last quoted conditions unless they transfer to the Southern Funds the portion of their reserves that is attributable to the respondents' past contributions. If they fail to do so, according to respondents, they will suffer from a "structural defect" which can be remedied by federal courts pursuant to the power conferred by § 302(e) to "restrain violations of this section."

The District Court granted petitioners' motion for summary judgment. Though it agreed with respondents that it had power to "review a challenge that the Greater Funds are structurally deficient under [§ 302(c)(5)'s] 'sole and exclusive' benefit standard," 710 F. Supp., at 61, 62, it found no "structural defect," since there was no allegation of corruption in the Greater Funds and since the transfer of assets would not further any collective-bargaining policies. *Id.*, at 64. The Court of Appeals reversed, holding that the Greater Funds "would suffer from a 'structural defect'" unless the funds transferred a portion of their assets to the Southern Funds. 935 F. 2d, at 534. It remanded for the District Court "to shape an appropriate remedy guided by the principle that a fair portion of the reserves reflecting contributions made to the Greater Funds on behalf of the [respondents' employees] should be reallocated to the Southern Funds." *Ibid.* We granted certiorari, 505 U. S. 1203 (1992).

## II

Both the District Court and the Court of Appeals relied on the Second Circuit's earlier decision in *Local 50, Bakery and Confectionery Workers Union, AFL–CIO* v. *Local 3, Bakery and Confectionery Workers Union, AFL–CIO,* 733 F. 2d 229 (1984), which held that federal courts have "'jurisdiction under [§ 302(e)] to enforce a trust fund's compliance with the statutory standards set forth in subsection (c)(5) by eliminating those offensive features in the structure or operation of the trust that would cause it to fail to qualify for a (c)(5) exception.'" *Id.,* at 234 (quoting *Associated Contractors of Essex Cty., Inc.* v. *Laborers Int'l Union of North America,* 559 F. 2d 222, 225 (CA3 1977)). *Local 50* and the decision below are among a large body of conflicting cases bearing upon federal courts' powers under § 302(e) to supervise the administration of § 302(c)(5) trust funds. A number of courts have held that § 302(e) confers broad supervisory powers. See, *e. g., Ponce* v. *Construction Laborers Pension Trust for Southern California,* 628 F. 2d 537, 541–542 (CA9 1980); *Lewis* v. *Mill Ridge Coals, Inc.,* 298 F. 2d 552, 558 (CA6 1962). Others have held that it confers no supervisory powers at all. See, *e. g., Ader* v. *Hughes,* 570 F. 2d 303, 306 (CA10 1978); *Bowers* v. *Ulpiano Casal, Inc.,* 393 F. 2d 421 (CA1 1968); *Moses* v. *Ammond,* 162 F. Supp. 866, 871–872 (SDNY 1958). Still others have acknowledged supervisory powers limited in various respects. See *Riley* v. *MEBA Pension Trust,* 570 F. 2d 406, 412–413 (CA2 1977); *Knauss* v. *Gorman,* 583 F. 2d 82, 86–87 (CA3 1978). Our most recent case in this area expressly reserved the question. See *Mine Workers Health and Retirement Funds* v. *Robinson,* 455 U. S. 562, 573, n. 12 (1982).

We hold today that § 302(e) does not provide authority for a federal court to issue injunctions against a trust fund or its trustees requiring the trust funds to be administered in the manner described in § 302(c)(5). By its unmistakable

language, §302(e) provides district courts with jurisdiction "to restrain violations of this section." A "violation" of §302 occurs when the substantive restrictions in §§302(a) and (b) are disobeyed, which happens, not when funds are administered by the trust fund, but when they are "pa[id], len[t], or deliver[ed]" to the trust fund, §302(a), or when they are "receive[d], or accept[ed]" by the trust fund, or "request[ed], [or] demand[ed]" for the trust fund, §302(b)(1). And the exception to violation set forth in paragraph (c)(5) relates, not to the purpose for which the trust fund is in fact used (an unrestricted fund that happens to be used "for the sole and exclusive benefit of the employees" does not qualify); but rather to the purpose for which the trust fund is "established," §302(c)(5), and for which the payments are "held in trust," §302(c)(5)(A).[2] The trustees' failure to

---

[2] JUSTICE STEVENS asserts that our holding is "uninvited," *post*, at 601, was "quite unanticipated by the submissions of the parties" *post*, at 595, and has been reached "[w]ithout the benefit of argument . . . by either litigant," *ibid.* That is not so. The Summary of Argument in petitioners' brief began with the assertion that §302(c)(5) was only "a narrow exception to a broad criminal prohibition." Brief for Petitioners 7. The first subdivision of the Argument elaborated on that point, arguing that the provision conferred no authority "to oversee the administration of employee benefit plans." *Id.*, at 8. And the next subdivision, entitled "Lower Federal Courts Have Misconstrued Section 302(c)(5) in Asserting Broad Jurisdiction over the Regulation of Employee Benefit Plans," systematically criticized the lower court jurisprudence permitting regulation of benefit plans, including cases from almost every Circuit. *Id.*, at 11–18. The subdivision concluded: "[T]he federal courts simply do not have the power, by reason of Section 302(c)(5), to restructure and regulate employee benefit plans." *Id.*, at 18 (footnote omitted). By attacking the basic authority of federal courts to regulate §302(c)(5) trust funds, petitioners raised the issue we decide here, and amply discussed the considerations bearing upon it. Respondents evidently understood the import of petitioners' argument. They devoted an entire subdivision of their brief to the topic "Federal Courts Have Authority To Remedy Violations Of Section 302(c)(5) In Civil Cases." See Brief for Respondents 17–19. In response to our point here, JUSTICE STEVENS quotes a passage from a

*comply* with these latter purposes may be a breach of their contractual or fiduciary obligations and may subject them to suit for such breach; but it is no violation of § 302.[3]

A few courts and some academic commentators have drawn an analogy between §§ 301 and 302 of the LMRA and have suggested that, as § 301 has been held to create a federal common law governing labor contracts, see *Textile Workers* v. *Lincoln Mills of Ala.*, 353 U. S. 448 (1957), so too should § 302 be viewed as authorizing the development of "a specialized body of federal common law of trust administration." Goetz, Developing Federal Labor Law of Welfare and Pension Plans, 55 Cornell L. Rev. 911, 930 (1970). One court

---

*different* section of petitioners' brief and claims that it is "disingenuous" to characterize *that* argument as a broad attack on a federal court's power. *Post*, at 598, n. 4. We do not do so.

[3] JUSTICE STEVENS concludes that "it is perfectly clear that funds are no longer 'held in trust for the purpose' of benefiting employees if, immediately after deposit into a legitimate trust fund, they are diverted for some improper purpose." *Post*, at 597–598, n. 3. It is true that funds are "no longer" held in trust if they are misappropriated (just as it is true that funds are "no longer" held in trust when they are paid out in the form of pensions), but it is also irrelevant. If the payments, when received by the relevant employee representative, "are held in trust" and that trust satisfies the other requirements of § 302(c)(5) (including that it have been "established" for the proper purposes), the exception in § 302(c)(5) applies and the payments do not violate § 302. This was our precise holding in *Arroyo* v. *United States*, 359 U. S. 419 (1959). The union official in that case, immediately upon receiving the employer's contributions to the trust fund, had begun diverting the funds to improper purposes. See *id.*, at 422. Indeed, "the evidence could properly support an inference that the [union official's] purpose *from the outset* was to appropriate the [contributions to the fund] for his own use." *Id.*, at 423 (emphasis added). Nevertheless, we held that the employer's payments were "within the precise language of § 302(c)." *Ibid.* We deemed the payments to have been "held in trust for the purpose" of benefiting employees since they were made to a trust fund established for that purpose. See *id.*, at 421, 423. JUSTICE STEVENS criticizes us for relying on this "half" of *Arroyo* while disregarding the other "half," see, *post*, at 595, n. 1, but the "half" to which we adhere is holding, and the "half" we disregard, dictum.

has said, quoting *Lincoln Mills, supra,* at 457, that "jurisdiction in a case of this kind can be found within the 'penumbra of express statutory mandate' of Section 302." *Lugo v. Employees Retirement Fund of Illumination Products Industry,* 366 F. Supp. 99, 103 (EDNY 1973), quoted approvingly in *Alvares* v. *Erickson,* 514 F. 2d 156, 166 (CA9), cert. denied, 423 U. S. 874 (1975). See also *Nedd* v. *United Mine Workers of America,* 556 F. 2d 190, 203 (CA3 1977), cert. denied, 434 U. S. 1013 (1978). A comparison of § 302(e) with § 301(a) shows that the analogy to *Lincoln Mills* is inapt. The latter provides a federal cause of action for any "violation of contracts between an employer and a labor organization." Subsection § 302(e), by contrast, provides no cause of action for a "violation of the fiduciary duties imposed pursuant to an employee benefit trust fund"; rather, it allows federal courts to "restrain violations" of § 302, which, as we have explained, occur when payments to a nonqualifying trust are made or received.

The text of § 302 requires that, if payments are to be exempt from its prohibition, they must be "held in trust for the purpose of paying" employee benefits and the trust must be "established" for the sole and exclusive benefit of the employees. There is nothing to suggest that this had the ambitious purpose of establishing an entire body of federal trust law, rather than merely describing the character of the trust to which payments are allowed, leaving it to state law to determine when breaches of that trust have occurred and how they may be remedied. As observed by the court in *Moses* v. *Ammond,* 162 F. Supp., at 872, n. 14, § 302(c)(5) is akin to a provision such as § 401(a) of the Internal Revenue Code, 26 U. S. C. § 401(a) (1988 ed. and Supp. III), which (in connection with 26 U. S. C. § 501 (1988 ed. and Supp. III)) provides a tax exemption for employer-created pension trust funds so long as, *inter alia,* they are "created . . . for the exclusive benefit of [the employer's] employees or their beneficiaries." No one would contend that that provision confers

upon the federal courts authority to govern and enforce the trusts, and there is no more reason to reach such a conclusion here.

Respondents point to our statement in *Arroyo* v. *United States*, 359 U. S., at 426–427, that "[c]ontinuing compliance with [the standards of § 302(c)(5)] in the administration of welfare funds was made explicitly enforceable in federal district courts by civil proceedings under § 302(e)." See also *Robinson*, 455 U. S., at 573, n. 12 (referring to this passage). The statement is perhaps susceptible of the reading that "compliance" was "made . . . enforceable" by authorizing district courts to prohibit further payments to an entity that was not established, or does not hold its funds in trust, for the requisite purposes. But in any case, *Arroyo* was a criminal prosecution brought under § 302(d), and the statement was therefore pure dictum.[4] Also dictum was our statement in *NLRB* v. *Amax Coal Co.*, 453 U. S. 322, 331 (1981), later quoted in *Robinson, supra,* at 570, that "the 'sole purpose' of § 302(c)(5) is to ensure that employee benefit trust funds 'are legitimate trust funds, *used actually for the specified benefits to the employees of the employers who contribute to them* . . . .'" (Emphasis added.) This *obiter* quotation of a line from the floor debate on the LMRA cannot convert (1) a

---

[4] While JUSTICE STEVENS does not dispute that this statement was dictum, he argues that "the *reasoning* that led us to [that] conclusion . . . is not so easily dismissed." *Post*, at 596 (emphasis added). We disagree. As one will see by reading the relevant passage from *Arroyo* (set forth in the concurrence, *post*, at 596–597), the "reasoning" consisted of leaping from the correct premise, that Congress limited the purposes for which exempt trust funds could be used, to the entirely unsupported conclusion, that § 302(e) rather than state trust law was to be the means by which that limitation was enforced. It is an *ipse dixit*, rather than a reasoned conclusion—and, to boot, an *ipse dixit* contradicted by the very holding of the case in which it was pronounced. *Arroyo* held that malfeasance in the administration of trust funds did not create federal *criminal* liability under § 302, and there is no basis in either text or reason why it should nonetheless create federal *civil* liability.

statutory statement of trust obligations that must exist to obtain an exemption into (2) a statutory authorization to enforce trust obligations.[5]

Consistently with the text of § 302(c)(5), and the structure of § 302 in general, we view the "sole and exclusive benefit" and "held in trust" provisions of that paragraph as neither creating nor imposing a federal trust law standard, but rather as simply requiring a trust obligation for the specified purposes, defined and enforced originally under state law, see Restatement (Second) of Trusts § 170(1) (1959), and now under ERISA.[6] Cf. *Amax Coal, supra*, at 329–330. Respondents do not deny that the Greater Funds are held subject to such a trust obligation. The fiduciaries of the Greater Funds are subject to the fiduciary obligations of ERISA, including the so-called exclusive benefit requirement of 29 U. S. C. § 1104(a)(1)(i), and are liable under 29 U. S. C. § 1109(a) to legal and equitable remedies for failure in those obligations. Since the Greater Funds are entities that qualify under § 302(c)(5), equitable relief under § 302(e) restraining future payments to them would not be appropriate.

---

[5] JUSTICE STEVENS' concluding words are that our action today is "a radical departure from the doctrine of judicial restraint." *Post,* at 601. We have already refuted his claim that our ruling is reached uninvited and without benefit of argument. See *supra,* at 588–589, n. 2. His lack-of-restraint criticism seems principally directed, however, at our "departure from [the] understanding" of § 302(c)(5), *post,* at 601, reflected in the dicta of earlier cases—such as the excerpt that he quotes from *Mine Workers Health and Retirement Funds* v. *Robinson,* 455 U. S. 562, 573, n. 12 (1982) (STEVENS, J.), see *post,* at 600. This seems to us a topsy-turvy version of judicial restraint. It was, if anything, those dicta themselves—uninvited, unargued, and unnecessary to the Court's holdings—which insulted that virtue; and we would add injury to insult by according them precedential effect.

[6] Title 29 U. S. C. § 1104(a)(1) (1988 ed. and Supp. III) provides: "[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

In addition to the § 302 claim, respondents' complaint asserted two ERISA claims, one based on ERISA's asset transfer rules, 29 U. S. C. § 1414, and the other on ERISA's above-mentioned fiduciary duty provision, § 1104. The District Court ruled against respondents on both claims but, because of its ruling on § 302, the Court of Appeals did not reach them. Neither do we and, on remand, the Court of Appeals will be free to consider them.

\*     \*     \*

The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE WHITE and JUSTICE BLACKMUN join, concurring in the judgment.

The judgment of the Court of Appeals should be reversed because petitioners' failure to transfer assets to respondents' Southern Funds did not violate § 302(c)(5) of the Labor Management Relations Act, 1947 (LMRA), 29 U. S. C. § 186(c)(5) (1988 ed., Supp. III). Because the Court unnecessarily decides that § 302(e) of the LMRA would not authorize injunctive relief even had petitioners violated the specific standards of § 302(c)(5), I do not join its opinion.

As the Court explains, see *ante*, at 582–584, this case arose when respondent employers withdrew from the Greater Funds, a multiemployer trust fund, and negotiated an independent union agreement establishing the Southern Funds. Respondents then sought a transfer to the Southern Funds of that portion of the Greater Funds' assets representing respondents' past contributions on behalf of their employees. 935 F. 2d 528, 531 (CA2 1991). The Court of Appeals agreed that a transfer was necessary, reasoning that retention by the Greater Funds of the assets contributed by respondents would violate the "sole and exclusive benefit" provision of

§ 302(c)(5). *Id.*, at 533–534; see *ante*, at 586. We granted certiorari to review that holding. See Pet. for Cert. i.

I would decide this case on the narrow ground presented: that the refusal to make the transfer at issue did not violate § 302(c)(5), 29 U. S. C. § 186(c)(5) (1988 ed., Supp. III). That provision allows payments into trusts not only "for the sole and exclusive benefit of the employees of [the contributing] employer," but also for the benefit of "such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents." To the extent respondents' previous contributions to the Greater Funds have not been used already to benefit respondents' own employees, they now will be used for the benefit of "employees of other employers making similar payments, and their families and dependents." *Ibid.* Hence, the Greater Funds continue to operate within the constraints of § 302(c)(5), and no transfer is required.

That some portion of respondents' contributions will go to benefit the employees of other contributors is, of course, in the nature of a multiemployer plan. Such plans operate precisely as suggested by the language of § 302(c)(5), by pooling employer contributions for the joint benefit of all participating employees. Segregation of funds by an employer is neither feasible nor contemplated. "An employer's contributions are not solely for the benefit of its employees or employees who have worked for it alone." *Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal., post,* at 638. See also *Stinson* v. *Ironworkers Dist. Council of Southern Ohio and Vicinity Benefit Trust,* 869 F. 2d 1014, 1021–1022 (CA7 1989) (use of employer's contributions for benefit of other than own employees does not violate "sole and exclusive benefit" requirement); *British Motor Car Distributors, Ltd.* v. *San Francisco Automotive Industries Welfare Fund,* 882 F. 2d 371, 377–378 (CA9 1989) (same).

In short, I agree with the United States, appearing as *amicus curiae*, that petitioners did not violate § 302(c)(5) when they refused to transfer some proportional share of assets to the Southern Funds. The Court eschews this straightforward rule of decision, however, in favor of a far broader approach, quite unanticipated by the submissions of the parties. Without the benefit of argument on the point by either litigant, the Court reaches out to overrule decades of case law by deciding that § 302(e) does not authorize a civil remedy for violations of § 302(c)(5). In my view, this reinvention of § 302 of the LMRA is as unwise as it is uninvited.

Section 302(c)(5) performs two distinct functions in the statutory scheme. First, as an exception to the criminal prohibitions of §§ 302(a) and (b), § 302(c)(5) provides a "safe harbor" for contributions to legitimate pension funds. See *ante*, at 586. Second, § 302(c)(5) sets forth certain standards that must be observed in the ongoing administration of such funds. The importance of both these functions is illustrated by our decision in *Arroyo* v. *United States*, 359 U. S. 419 (1959), which involved a contribution lawful when made and thereafter diverted to an unlawful use. Because the payment was to a legitimate trust fund, we held, the transaction fell within § 302(c)(5)'s exception, so that receipt of the payment was not a criminal violation of § 302(b). *Id.*, at 423–424. At the same time, however, § 302(e) was available to provide a civil remedy for the violation of § 302(c)(5) that occurred when the funds subsequently were diverted. *Id.*, at 426–427.[1]

---

[1] The majority relies heavily on one half of *Arroyo* while disregarding the other. See *ante*, at 589, n. 3. I note here only that the Court in *Arroyo* never determined that funds diverted after establishment of a trust are "held in trust for the purpose" of benefiting employees, *ante*, at 589, n. 3; to the contrary, its reliance on § 302(e) to remedy such abuses supports quite the opposite conclusion. In any event, what *Arroyo* held is that payment

The majority repudiates this understanding of § 302(c)(5)'s operation, reflected also in *NLRB* v. *Amax Coal Co.*, 453 U. S. 322, 331 (1981), and *Mine Workers Health and Retirement Funds* v. *Robinson*, 455 U. S. 562, 570–572 (1982), as "pure dictum." *Ante*, at 591. But the reasoning that led us to our conclusion in *Arroyo* is not so easily dismissed. As we explained in that case, § 302(c)(5) was enacted not merely to exempt specified conduct from the prohibitions of §§ 302(a) and (b), but also to ensure that union trust funds, once established, would continue to benefit the designated employees. 359 U. S., at 424–427.

> "Congress believed that if welfare funds were established which did not define with specificity the benefits payable thereunder, a substantial danger existed that such funds might be employed to perpetuate control of union officers, for political purposes, or even for personal gain. See 92 Cong. Rec. 4892–4894, 4899, 5181, 5345–5346; S. Rep. No. 105, 80th Cong., 1st Sess., at 52; 93 Cong. Rec. 4678, 4746–4747. To remove these dangers, specific standards were established to assure that welfare funds would be established only for purposes which Congress considered proper and expended only for the purposes for which they were established. See Cox, Some Aspects of the Labor Management Relations Act, [61 Harv. L. Rev. 274, 290 (1947)]. Continuing compliance with these standards in the administration of welfare funds was made explicitly enforceable in federal district courts by civil proceedings under § 302(e). The legislative history is devoid of any suggestion that defalcating trustees were to be held accountable under federal law, except by way of the injunctive remedy

---

and receipt of trust funds do not violate §§ 302(a) and (b) if the funds are later diverted, not that the later diversion does not violate § 302(c)(5).

provided in that subsection." *Id.*, at 426–427 (footnote omitted).[2]

We made the same point in *Robinson*, stating that "'the sole purpose of § 302(c)(5) is to ensure that employee benefit trust funds are legitimate trust funds, used actually for the specified benefits to the employees of the employers who contribute to them . . . .'" 455 U. S., at 570 (quoting *Amax Coal*, 453 U. S., at 331) (internal quotation marks omitted). Our view that § 302(c)(5) imposed continuing obligations on the actual use of trust funds, we found, was "amply supported by the legislative history," 455 U. S., at 571, which reflected a concern that "funds contributed by their employers for the benefit of the employees and their families might be diverted to other union purposes or even to the private benefit of faithless union leaders," *id.*, at 572. See also *id.*, at 570–572, and nn. 8–10, and sources cited therein. To prevent trust funds once legitimate from turning into vehicles for kickbacks and racketeering, § 302(c)(5) requires not only that trust funds be "established" for proper purposes, but also that "employer contributions be *administered* for the sole and exclusive benefit of employees." *Id.*, at 572 (emphasis added).[3]

---

[2] When the Court characterizes this passage as "leaping" to an "entirely unsupported conclusion," see *ante*, at 591, n. 4, it ignores the abundant support for that conclusion in the legislative history cited in Justice Stewart's opinion.

[3] Though we did not belabor the point in *Robinson*, as it was then (as until today) undisputed, it should be noted that the relevant statutory text supports the conclusion that § 302(c)(5) creates ongoing obligations for trustees. According to the majority, § 302(c)(5)'s requirements of a trust "established" for the benefit of employees and funds "held in trust for the purpose" of paying employees relate to the purpose for which a trust is first established; hence, they are fulfilled entirely, if ever, at the time of establishment. See *ante*, at 588, 592. Even on this narrow question, I depart from the majority; in my view, it is perfectly clear that funds are no longer "held in trust for the purpose" of benefiting employees if, imme-

The proposition that § 302(c)(5)'s specific statutory standards are enforceable on a continuing basis has never been questioned before today, by this Court or by any court of appeals. It is true, as the majority notes, *ante,* at 587, that the precise scope of the civil remedy authorized by § 302(e) has been the subject of controversy. Some courts have read § 302(e) quite broadly to authorize relief in cases of "unreasonable" or "arbitrary and capricious" trust administration. See, *e. g., Phillips* v. *Alaska Hotel and Restaurant Employees Pension Fund,* 944 F. 2d 509, 515 (CA9 1991); *Stinson* v. *Ironworkers District Council of Southern Ohio and Vicinity Benefit Trust,* 869 F. 2d, at 1019.[4] Others have read § 302(e) more narrowly, as limited to remedying "violations of basic structure, as determined by the Congress, not violations of fiduciary obligations or standards of prudence in the administration of the trust fund." *Bowers* v. *Ulpiano Casal, Inc.,* 393 F. 2d 421, 424 (CA1 1968). For present pur-

———————

diately after deposit into a legitimate trust fund, they are diverted for some improper purpose.

More important, however, is the fact that other provisions of § 302(c)(5) clearly set forth standards for the continuing administration of trust funds. By their very terms, these standards demand compliance on an ongoing basis. See § 302(c)(5)(B) (employees and employers must be equally represented in fund administration); § 302(c)(5)(C) (payments to be used for pensions or annuities must be made to a separate trust). The obvious purpose of § 302(e)—a subsection largely overlooked by the majority—is to provide a vehicle for enforcing § 302(c)(5)'s ongoing obligations, among them the requirement that funds be held in trust for the benefit of employees.

[4] As the majority notes, petitioners argue that § 302(c)(5) does not authorize such broad jurisdiction to "restructure and regulate employee benefit plans." See *ante,* at 588, n. 2. More precisely, the position with which respondents take issue in the cited pages of their brief, see *ibid.,* is that "a collectively bargained term of an employee benefit plan is not subject to federal court review for reasonableness under Section 302 of LMRA." Brief for Petitioners 19; see Brief for Respondents 18. It is disingenuous, to say the least, to characterize petitioners' argument as one "attacking the basic authority of federal courts to regulate § 302(c)(5) trust funds." *Ante,* at 588, n. 2. See n. 6, *infra.*

poses, however, the important point is that every Court of Appeals has assumed that the federal courts may, at a minimum, enforce compliance with §302(c)(5)'s express commands.[5]

Our unanimous opinion in *Robinson* is consistent with this well-established body of case law. In *Robinson,* we considered and rejected one of the broader views of §302(c)(5), holding that the provision does not empower the federal courts to impose a nonstatutory "reasonableness" requirement on trust fund eligibility criteria established by collective-bargaining agreement. 455 U. S., at 574. We also left open the question whether §302(e) authorizes enforcement of the traditional fiduciary duties of trustees. *Id.,* at 573, n. 12.[6] The question with which we had no difficulty,

---

[5] See, *e. g., Bowers* v. *Ulpiano Casal, Inc.,* 393 F. 2d 421, 424, n. 4 (CA1 1968); *Lugo* v. *Employees Retirement Fund of Illumination Products Industry,* 529 F. 2d 251, 254–256 (CA2 1976); *Sheet Metal Workers' Local 28 of New Jersey Welfare Fund* v. *Gallagher,* 960 F. 2d 1195, 1210 (CA3 1992); *Seafarers Pension Plan* v. *Sturgis,* 630 F. 2d 218, 220–221 (CA4 1980); *Johnson* v. *Franco,* 727 F. 2d 442, 446–447 (CA5 1984); *Sellers* v. *O'Connell,* 701 F. 2d 575, 577 (CA6 1983); *Stinson* v. *Ironworkers District Council of Southern Ohio and Vicinity Pension Trust,* 869 F. 2d 1014, 1019 (CA7 1989); *Holcomb* v. *United Automotive Assn. of St. Louis, Inc.,* 852 F. 2d 330, 332–335 (CA8 1988); *Ponce* v. *Construction Laborers Pension Trust for Southern California,* 628 F. 2d 537, 541–542 (CA9 1980); *Ader* v. *Hughes,* 570 F. 2d 303, 306–308 (CA10 1978); *Central Florida Sheet Metal Contractors Assn., Inc.* v. *NLRB,* 664 F. 2d 489, 498 (CA5 1981); *Central Tool Co.* v. *International Assn. of Machinists Nat. Pension Fund,* 258 U. S. App. D. C. 309, 322, n. 77, 811 F. 2d 651, 664, n. 77 (1987).

[6] The Court seems to assume that the question reserved in *Robinson* was the very different one it answers today. See *ante,* at 587.

Petitioners, on the other hand, share our understanding of what was decided in *Robinson* and what remained open for decision. Notwithstanding the protestations of the majority, see *ante,* at 588–589, n. 2, petitioners' argument on this point was limited to the proposition that §302(c)(5) does not "establish federal fiduciary standards for trustees of employee benefit plans," Brief for Petitioners 10. Petitioners never argue that §302(e) does not provide a remedy when the specific standards of §302(c)(5) are violated; to the contrary, petitioners cite with approval the holding from *Bow-*

however, is the one that the Court reaches out to answer today. We unequivocally stated:

> "It is, of course, clear that compliance with the specific standards of § 302(c)(5) in the administration of welfare funds is enforceable in federal district courts under § 302(e) of the LMRA." *Ibid.*[7]

The Court now seems to assume that it is confronted with a choice between "establishing an entire body of federal trust law," *ante,* at 590, on the one hand, and limiting the scope of § 302(e) to injunctions against the making or acceptance of prohibited payments, on the other. As *Robinson* makes clear, however, there is no need to go so far in either direction; our understanding that § 302(e) provides a remedy for violations of § 302(c)(5)'s specific standards is independent of any view as to whether § 302(e) makes general fiduciary duties enforceable in federal court.

---

*ers, supra,* that the only violations "within the federal courts' authority involved the failure to meet the *specific* requirements of Section 302(c)(5)." Brief for Petitioners 12 (emphasis in original). Nor do petitioners ever argue that § 302(c)(5)'s "exclusive benefit" obligation is satisfied finally at the time of trust establishment; rather, petitioners understand § 302(c)(5) to require that a trust "(1) *use* employer contributions only for specified types of benefits; (2) *use* those assets only for benefits for employees and families of the contributing employer and the employees and families of other contributing employers . . . ." *Id.,* at 8 (emphasis added).

[7] Had this basic proposition been challenged in *Robinson*—and had the Court as then constituted found any merit in the challenge—then it would have been unnecessary to go on to decide whether the discrimination in that case violated § 302(c)(5) as "unreasonable." In other words, this proposition provided the framework for all of the reasoning in *Robinson,* just as it provided the framework for all of our post-*Arroyo* cases under this statute. Whether or not the label "dicta," see *ante,* at 592, n. 5, is appropriately applied to such a proposition, our statement in *Robinson* represented an interpretation of an important federal statute that had been accepted uniformly by the bar, the judiciary, and the Congress for over three decades, since *Arroyo* was decided in 1959. The Court today simply ignores the interest in adhering to settled rules of law that undergirds the doctrines of *stare decisis* and judicial restraint.

In my view, if a trust fund is not complying with the standards of § 302(c)(5)—if, for instance, it is making annual contributions to the Red Cross—then a federal court is authorized by § 302(e) to enjoin the improper diversion of funds. There is no sensible reason why the court should instead be restricted to enjoining future payments to the fund, or receipt of those payments, as violations of §§ 302(a) and (b). Congress intended § 302(c)(5) to operate as a guarantee against diversion of trust funds, and this purpose is effectuated by the reading we have always before given § 302. Today's departure from this understanding seriously undermines the functioning of the statute. The Court's action is not only uninvited and unnecessary; it is a radical departure from the doctrine of judicial restraint.