CANBY, Circuit Judge:
I.
Annie Bolton’s effort to obtain benefits from the Construction Laborers’ Pension Trust for Southern California (Plan) dates back to January of 1987 when, as the widow of Plan participant Levi Bolton, she applied to the Plan for survivor benefits. The factual background of Bolton’s case is set out in Bolton v. Construction Laborers’ Pension Trust for Southern California, 954 F.2d 1437, 1438-39 (9th Cir.1991) (Bolton I). In that decisión, we concluded that for Plan participants like Levi who otherwise completed the fifteen years of credited service required for their pension rights to vest, the Plan’s “break-in-service” rule applied only to voluntary breaks in service.[1] We held that the Plan acted arbitrarily in applying the rule to Levi before determining whether or not his break was voluntary.
Our decision in Bolton I was based partly on the fact that the break-in-service rule is designed to encourage competent employees to remain in the industry by penalizing them for choosing to work in non-covered employment for an extended period. The rule’s underlying purpose is not served, we reasoned, if it is applied to employees who are forced out of the industry because of lack of jobs; the incentive of pension benefits for remaining in the industry is meaningless to them because remaining in the industry is impossible. We held that, when these employees return to the industry and complete the required number of years of service to qualify for pension benefits, cancellation of their prior credits due to their involuntary departure from the industry is arbitrary and capricious. See Bolton I, 954 F.2d at 1439-40. We remanded to the district court the question whether Levi’s break in service was involuntary.
In the same appeal, Bolton also argued that the Plan should be estopped from arguing that Levi’s break was voluntary because Levi relied on the Plan’s assurances that he was fully vested, and he therefore failed before he died to accumulate evidence that his break was involuntary. We remanded to the district court the question whether the Plan is equitably estopped from arguing that Levi’s break was voluntary because the Plan had advised Levi three times before his death that he was fully vested. Id. at 1440.
After we issued the Bolton I decision, the district court sent the case back to the Plan’s Pension Appeals Committee for a hearing to determine whether Levi’s failure to perform “credited service” in 1974 and 1975 was involuntary. The Pension Appeals Committee determined that Levi’s failure was the result of a voluntary choice not to engage in covered employment. Bolton challenged this decision in the district court and filed a motion for summary judgment. The district court granted Bolton’s motion and ordered that the Plan was liable to Bolton for benefits retroactive to May of 1988 with interest, and that Bolton’s counsel was entitled to attorney’s fees payable by the Plan. The district court reasoned that Levi relied on the Plan’s assur- *1058 anees that he was entitled to a pension, and that this reliance was to his detriment because it caused him not to collect evidence to show that his break in service was involuntary. Therefore, the court concluded, the Plan was equitably estopped from presenting evidence that Levi’s break in employment was voluntary.
The Plan appeals the district court’s order. As a threshold matter, the Plan contends that the district court never had jurisdiction over Bolton’s claim. It also argues that the district court erred on the merits in determining that the Plan is equitably estopped from arguing that Levi’s failure to perform credited service for two years was voluntary.
II.
As the Plan points out, according to a Supreme Court decision issued after Bolton I, the district court never had jurisdiction to hear Bolton’s case under the Labor Management Relations Act, 29 U.S.C. §§ 141 et seq. Local 144 Nursing Home Pension Fund v. Demisay, — U.S. -, -, 113 S.Ct. 2252, 2257, 124 L.Ed.2d 522 (1993) (federal courts do not have jurisdiction over claims that trust funds or their trustees violated 29 U.S.C. § 186(c)(5)). It did have jurisdiction, however, to decide Bolton’s case under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 et seq. (1985 & Supp.1994). Under ERISA, Bolton could bring a civil action in district court to recover benefits due to her under the terms of the Plan. 29 U.S.C. §§ 1132(a)(1)(B) and (e)(1).
The Plan argues that the Pension Appeals Committee’s denial of Bolton’s application could not be reviewed under ERISA because Levi’s failure to perform 300 hours of credited service for two consecutive years occurred before ERISA standards became applicable to the Plan. Assuming that the Plan’s assertion that ERISA did not govern the Plan during the period of Levi’s break is correct, we must determine whether ERISA nonetheless applies to the Pension Appeals Committee’s decision to deny Bolton benefits. ERISA applies if (1) Bolton’s cause of action and (2) the “act or omission” that formed the basis for her cause of action both occurred after ERISA became applicable to the Plan. Menhorn v. Firestone Tire & Rubber Co., 738 F.2d 1496, 1500 (9th Cir.1984).
The parties dispute whether ERISA standards became applicable to the Plan on January 1, 1975 or January 1, 1976, but that dispute does not affect our decision. Bolton’s cause of action arose in 1987 when she was denied benefits. Id. at 1502 (“ERISA cause of action based on a denial of benefits accrues at the time the benefits are denied.”). We also find that the “act or omission” at issue occurred in 1987 when the Plan’s break-in-service rule was applied to Levi. In Menhom we noted that in cases where benefits are denied “as the result of a significant act of discretion under or interpretation of the plan which took place after ERISA’s effective date,” the date of the “act or omission” is the date on which the plan provision at issue is applied to the individual. Id. at 1502-03; Smith v. Retirement Fund Trust, 857 F.2d 587, 590 (9th Cir.1988). For the reasons discussed below, we find that the Plan’s 1987 decision to apply the break-in-service rule to Levi without determining whether his break was voluntary was a “significant act of ... interpretation of the plan.”
Menhom sheds light on tbe meaning of a “significant act of ... interpretation of the plan” by contrasting it to decisions that are made “pursuant to an unambiguous and non-discretionary plan provision....” Menhorn, 738 F.2d at 1501. The Pension Appeals Committee engaged in a “significant act of ... interpretation of the plan” when it applied the break-in-service rule to Levi because the Plan was ambiguous as to whether involuntary breaks would be treated as “breaks-in-service” which, if incurred before the participant accrued fifteen years of credited service, cancelled all of the participant’s prior credits.
It is true that in Bolton I, we noted that the Plan’s break-in-service rule “as written” applied to Levi’s 1974-1975 failure to earn credited service. Bolton I, 954 F.2d 1438 n. 1. Our focus was not on the issue of ambiguity, however. We went on to hold that the Pension Appeals Committee acted arbitrarily and capriciously when it applied the break-in-service Rule to Levi without *1059 determining that his break was incurred voluntarily. Id. at 1439. In essence, then, our holding in Bolton I amounted to a determination that the Plan contained a latent ambiguity[2] as to whether the break-in-service rule applied to involuntary breaks, and that the Pension Appeals Committee acted arbitrarily and capriciously in interpreting the rule to include involuntary breaks where the participant otherwise completed the fifteen years of credited service required for his pension to vest.
The reasoning behind our conclusion that it would be arbitrary to apply the “break-in-service” rule to Levi if his break was involuntary is discussed fully in Bolton I. For the purpose of the district court’s jurisdiction over Bolton’s claim, we simply point out that, because the Pension Appeals Committee engaged in a significant act of interpretation of the Plan when it resolved the ambiguity against Bolton, the “act or omission” at issue was the Pension Appeals Committee’s 1987 rejection of Bolton’s application for benefits. Therefore, the district court had jurisdiction to review the Pension Appeals Committee’s decision under ERISA.
III.
The Plan also argues that the district court erred in holding that the Plan is equitably estopped from presenting evidence that Levi’s break was voluntary. Among other requirements for the Plan to be equitably estopped are that the Plan’s break-in-service provision be “ambiguous such that reasonable persons could disagree as to [its] meaning or effect,” and that representations are made to the employee interpreting the plan. Greany v. Western Farm, Bureau Life Ins. Co., 973 F.2d 812, 821-22 (9th Cir.1992) (quoting Alday v. Container Corp., 906 F.2d 660, 666 (11th Cir.1990)); see also Watkins v. Westinghouse Hanford Co., 12 F.3d 1517, 1527 (9th Cir.1993) (same). As we noted above, our decision in Bolton I determined that the break-in-service rule contained a latent ambiguity as to whether it would apply to involuntary breaks. It is undisputed that Plan officials represented to Bolton that his benefits under the Plan were vested. Greany’s requirements of ambiguity and interpretation are therefore satisfied.
The additional requirements to establish equitable estoppel are set forth in Ellenburg v. Brockway, Inc., 763 F.2d 1091 (9th Cir.1992). To prevail, Bolton must show that (1) the Plan representatives knew the facts; (2) they intended their representation to be acted upon, or that their conduct was such that Levi had a right to believe that they so intended; (3) Levi was ignorant of the true facts, and (4) Levi relied on the Plan representatives’ assurances to his injury. See id. at 1096.
The record clearly establishes that the Plan representatives were in possession of Plan documents setting forth the break-in-service provisions, that they represented to Levi that his retirement benefits were vested, and that they did so intending him to rely on their answer. As the district court pointed out, the Plan representatives were sophisticated in their knowledge of the Plan, and Levi and his wife were not; they relied on the expertise of the Plan officials. Thus the first three requirements of equitable estoppel are satisfied, and the Plan does not argue to the contrary.
*1060 It is the fourth requirement that is in dispute. The Plan argues that, even if Levi had been properly informed that his benefits depended upon the involuntariness of his break in service, it is unlikely that he could have compiled evidence demonstrating that his break was involuntary.[3] This argument misses the point, however. The Plan’s erroneous representations prevented Levi from assembling, before his death, the evidence to support his widow’s later claim.[4] Evidence gathered long after the events in issue, and after the death of the prime participant, is necessarily incomplete; witnesses and documentation of Levi’s efforts to secure covered employment cannot be found. As the district court ruled, Bolton’s case was prejudiced because Levi had been led not to gather his evidence during his lifetime. Bolton has therefore been injured. Her inability to produce evidence, which was caused by the Plan’s representations, cannot be held against her. The Plan is equitably estopped to deny that Levi’s break was involuntary and that the benefits were vested.
The judgment of the district court is therefore AFFIRMED.

. The Plan required fifteen years of "credited service” in order for pension rights to vest. “Credited service” was defined as 300 or more hours of Plan-covered employment. The Plan had a “break-in-service” rule that provided that
[a]n Employee’s previously accumulated credits ... shall be cancelled if he fails to earn Credited Service during a period of two consecutive calendar years.
In both 1974 and 1975 Levi failed to earn credited service. The Pension Appeals Committee denied Bolton benefits on the ground that Levi lost the fourteen years of credited service he accumulated prior to 1974 because of his failure to earn credited service in 1974 and 1975, and therefore his pension rights had not vested.

. A "latent” or "extrinsic" ambiguity exists when, “although the agreement itself is a perfectly lucid and apparently complete specimen of English prose, anyone familiar with the real-world context of the agreement would wonder what it meant with reference to the particular question that has arisen.” Federal Deposit Ins. Corp. v. W.R. Grace & Co., 877 F.2d 614, 620 (7th Cir.1989), cert. denied, 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990). In the present case, the Plan contained a "latent ambiguity” in that the break-in-service rule “as written” did not exempt involuntary breaks, yet anyone familiar with the fact that the rule’s purpose was to reward participants who remained in the industry would wonder whether it applied to Levi if his break was involuntary. See also Landro v. Glendenning Motorways, Inc., 625 F.2d 1344, 1351 (8th Cir.1980) (under Minnesota and federal law of contracts as applied to pension plans, where plan by its terms credited only service with current employer, district court properly considered extrinsic evidence for purpose of determining that plan was latently ambiguous as to whether employment with predecessor employer would be credited).

. As the Plan correctly notes, its representations to Levi that his benefits were vested came after his break in service. The injury to Levi from reliance on the representations is therefore not the break itself, but the failure later to assemble evidence concerning the involuntary nature of the break.

. Contrary to the Plan's contentions, it is not pure speculation to conclude on this record that Levi could have documented that his break was involuntary. For example, Levi collected unemployment insurance for the first year of his break in service. There was evidence that to be eligible to collect unemployment, the worker had to show up at the Union Hall every weekday to get his unemployment card stamped each Monday. Further, for the second year of the break, Levi worked in the Comprehensive Employment Training Act (CETA) program, which required exhaustion of unemployment insurance and was intended for those unemployed workers with low prospects of finding a job. These indications that Levi attempted and failed to find covered employment suggest that, had Levi not relied on the Plan's assurances, he could well have collected records and presented testimony before his death to verify his efforts to continue his covered employment.